BEAN, (BROOKMIRE v.) See Case No. 1,-942.

---

## Case No. 1,171.

### · BEAN et al. v. The GRACE BROWN.

[2 Hughes, 112.] [1]

District Court, E. D. Virginia. May 10, 1841.

SALVAGE BY PILOTS—SHIP TEMPORARILY ABANDONED.

1. Regularly authorized and licensed pilots are entitled to compensation for salvage, where their services are extraordinary and beyond the strict line of their professional duty.

2. Where a master and crew voluntarily leave a ship while in peril of the sea, with the bona fide intention of returning to her, the ship is not derelict.

3. Where a ship, thus left by her crew, is found by pilots, after the weather has abated in violence, and is brought into port without danger or much difficulty, they are entitled to liberal compensation, say $2,400, when the ship and cargo are worth $38,000.

[Cited in The Ann L. Lockwood, 37 Fed. 237.]

[In admiralty. Libel by Bean and others against the ship Grace Brown, for salvage. Decree for libellants.]

The libellants are pilots, from Baltimore, duly authorized to act as such, and claim salvage, for themselves and their respective crews. They propound that while cruising off the capes of Virginia, on the lookout for vessels requiring their services, Captain Bean, on the 8th January, 1841, spied a ship on shore on Smith's Island flats, which proved to be the Grace Brown, of Baltimore. That finding himself unable to relieve her, he procured the assistance of the other libellants, and again boarded the ship at 1 o'clock on the morning of Saturday, the 9th of January; that there was no human being on board, and that the ship was abandoned and derelict; that she was in imminent peril, frequently striking the bottom, with a heavy sea surging over her, with eight or nine feet of water in her hold, and in danger of going to pieces. That by incessant labor and at the peril of their lives, and their three pilot-boats, they succeeded in rescuing her from

her perilous situation, and brought her and her cargo in safety to the port of Norfolk, where they secured her at the wharf at 8 o'clock p. m. of the same day.

A claim is interposed by Henry Duff, master and part owner of the Grace Brown, in behalf of himself and the other owners of the ship. He alleges that his ship sailed from Liverpool on the 12th of November, 1840, bound to Baltimore, with an assorted cargo, and had uninterrupted voyage until the 7th January, when the ship struck, as he supposed, on the middle ground off Cape Henry, and sprung a leak; that he displayed the usual signal for a pilot without obtaining one; that after endeavoring to extricate her from the difficulties of her situation, at half-past 10 o'clock a. m. on the 7th of January, he hove out his anchor, by which he rode securely while he remained on board; that about half past 4 o'clock p. m. he left the ship with his officers and crew, in the long boat, to go ashore for assistance, with the intention of an immediate return to the ship with aid; that her danger arose from his ignorance of the localities, and mainly from the wind's blowing a strong gale from the S. E., or on shore. That the ship was not derelict, and when the services of the libellants were rendered, her situation was not imminently dangerous. That after using every effort, and all the dispatch which he could control, he returned on the morning of Saturday, the 9th, to the spot where he had left the ship at anchor, and found that she was not there. He became satisfied that he had seen her, on his way out, under sail to Norfolk; pursued, and at 11 o'clock p. m. found her at the wharf in possession of the libellants, who refused to deliver her up. That the libellants are pilots, and the ship at the time of the salvage service was within their pilotage-ground. The libellants claim the highest rate of salvage, on the ground stated, and the owners, admitting that although pilots, the libellants are entitled to compensation, contend that so small were their risk and service, that the lowest rate of remuneration should be adopted. The ship and cargo are appraised at $38,928.

MASON, District Judge.[2] The material facts in dispute between the parties are: 1. Whether the ship was abandoned by the officers and crew, and was in a state of derelict, when she was taken possession of by the libellants, or not? 2. Whether the situation of the ship and cargo was imminently perilous, at the time of the salvage, and in what degree?

The depositions of some of the libellants are taken and read as evidence in the cause. This is legal evidence; it forms an exception, from the necessity of the case, to the general rule, that a person interested in the re-

---

[1] [Reported by Hon. Robert W. Hughes, District Judge, and here reprinted by permission.]

[2] Hon. John Y. Mason, afterwards secretary of the navy, attorney general, and minister to France.

sult of a cause is incompetent to testify. The testimony of salvors is admissible, "but only admissible as to facts occurring at the time of the salvage service, and in weighing that with the other evidence, its force will be greatly abated by opposing testimony from persons belonging to the crew of the saved ship," and a portion from other disinterested witnesses. The Boston, [Case No. 1,673.] Sensible of the embarrassment and difficulty of deciding on conflicting evidence and controverted facts without the aid of a jury, I have attentively considered the able and elaborate arguments of the counsel, and have carefully examined and weighed the testimony in the cause. By the owners, it is proved that the ship securely rode by three anchors, in four fathoms water, from 10 o'clock a. m. to half-past 4 o'clock p. m., when the master and crew left her on the 7th; that during that time the wind was blowing a gale on shore, and the sea running high, but had not moved her from her moorings; that the ship's draft was less than 17 feet, and I consider that the weight of evidence leaves no doubt that, though leaking, water in her hold was never more than 4½ feet aft and 5½ forward; that the captain and crew went ashore for assistance, and though leaving the ship under strong apprehensions for her safety, he declared and evinced his purpose to be an immediate return to her; that he used every effort to procure aid, and on Saturday morning, with what he deemed the necessary aid, and all that he could command, he did return to the place where he had left her anchored, without any knowledge that the libellants were in possession of her; that the captain was a part owner, an experienced master, and a respectable man. The libellants rely on the condition in which the ship was found, the delay of the captain in his return, a supposed want of promptness in procuring the necessary aid, on the fact that no one was left on board, on the articles taken in the boat, and other circumstances, as showing that no intention to return existed at the time of leaving the ship, and no hope of recovering her or her cargo. Without entering into an argument, which has been conducted with great ingenuity on both sides, I am satisfied by the proofs that however imminent Captain Duff may have regarded the danger of his ship at the time of leaving her, he had then a fixed intention to return to her, whatever might be her fate. In the case of Clarke v. The Dodge Healy, [Case No. 2,849,] Justice Washington held, that in judging of the master's intention at the time of leaving his ship, great weight is to be given to his subsequent acts. "If," says he, "the intention were to leave her to her fate, and to use no further exertions to save, the master could have no motive for remaining on shore for the purpose of watching her motions and of discovering her situation the next morning." In that case the master and crew had

actually left his vessel under most imminent peril, and declared that he had abandoned her. Yet the learned judge held that his conduct showed that such was not his purpose, and dismissed the libel. In this case the captain left his ship, on reaching the shore declared his purpose to be an immediate return, applied for, and as soon as he could, procured, aid, and did return to where he left and where he expected to find her.

On the second point, more essential perhaps than the first in determining the rate of compensation to be made, it appears to me that the following facts are established: That the danger of the Grace Brown proceeded in the first instance from a want of that local knowledge which a pilot could have afforded, had the captain succeeded in getting one in time. That while the wind was S. E. her situation was more dangerous; that when the libellants commenced the work of salvage, the wind was N. N. W. and was favorable for getting her off; that she was got off by the rise of tide and the aid of her own sails; that she was prevented from going on shore by her anchors; that possessing the local knowledge belonging to their profession as pilots, the libellants incurred but little risk to their lives in the act of salvage; that as the weather was at that time, the pilot-boats were in no danger; and that in navigating the ship to Norfolk, the risk incurred was, under the circumstances existing, not considerable; that they commenced the act of salvage about one o'clock on Saturday morning, and arrived in safety at the wharf in Norfolk about eight o'clock in the evening of the same day. On these facts, the inquiry arises, Are the libellants entitled to salvage, and in what amount? Salvage is the compensation that is to be made to other persons by whose assistance a ship or its loading may be saved from impending peril or recovered from actual loss; and in fixing the rate of salvage the court has, usually, regard not only to the labor and peril incurred by the salvors, but also to the situation in which they may happen to stand with respect to the property saved; to the promptitude and alacrity manifested by them; to the value of the ship and cargo; and to the degree of danger from which they were rescued. And it is laid down as a principle which cannot be controverted, that, where it is proved that no human force could have averted the danger, unless Providence kindly aided the exertions by which the object is attained, it does not deprive the salvors of merit, but may diminish the rate of compensation. It is for rescue from present impending perils, and not those which might possibly under subsequent contingencies befall the property, that compensation is made. The danger of the property saved, at the time of saving, its value, the extent of service, the danger incurred in rendering it, to the lives and property of the salvors, their character, and their local knowledge, by

which the dangers to those not possessing it may be avoided, are all elements in making the delicate and difficult computation of the remuneration to be awarded as salvage. That the libellants are entitled to compensation for their services in this case is not denied. It is clearly established by repeated decisions, and especially by that of the supreme court of the United States, in the case of Hobart v. Drogan, 10 Pet. [35 U. S.] 108, "that however a pilot while acting in the strict line of his duty may entitle himself to extraordinary pilotage compensation for extraordinary services, as contradistinguished from ordinary pilotage for ordinary services, he cannot, therefore, be entitled to salvage. But a pilot as such is not disabled in virtue of his office from becoming a salvor. On the contrary, whenever he performs salvage services, beyond the line of his appropriate duties, or under circumstances to which those duties do not justly attach, he stands in the same relation to the property as any other class, that is, with a title to compensation to the extent of the merit of his services, viewed in the light of a liberal public policy. Regarding pilots as a useful and meritorious class of men, eminently contributing by their skill, intrepidity, and local knowledge to the success of navigation, the courts have not been disposed to impose on them duties beyond those appropriately belonging to their office, or to deprive them of the reward of dangers encountered in such extraordinary services. But as the peril incurred always enters largely into the estimate of remuneration to be made, their local knowledge will always be taken into consideration in estimating salvage services." On this principle, Sir William Scott decided the case of The Frow Margaretta, in 4 Rob. Adm. 84.[3] That was the case of a foreign vessel that had struck on a sandbank on the Essex coast, from which she was rescued by the master and crew of a fishing-smack. The court said that it would never be allowed that a claim of salvage should be ingrafted on the local ignorance of foreigners, who are, of course, not very likely to be well acquainted with the coast. The danger of the vessel arose from that ignorance; the salvors possessed the necessary local knowledge to extricate her without peril to themselves, and for their services fifty pounds were allowed them, and the service pronounced to be as low a degree of salvage merit as could be presented to the court. In the case of Hobart and Drogan, one-third of the appraised value of the brig and cargo was awarded as salvage. It is argued that there is a strong similitude between that and the case at bar. In many of the circumstances attending the adventure, in the means employed and in the character of the parties, there is. But, it seems to me, that in the circumstances which mainly regulate the salvage the resemblance is not strong. In that case the brig was in most imminent peril. In the hurricane which she encountered the masts and bowsprit were cut away, the water was making in her hold, her pumps were choked with coffee, and useless, and she was aground. The master and crew had abandoned her to save their lives. The salvors after unsuccessful attempts boarded her, with great danger to themselves. The wind was blowing in such a direction and with such violence that if the brig had not been taken possession of by the libellants she would have been drifted on the West Bank and become a complete wreck, so that the peril of the salvors and of the brig and cargo at the time of salvage was great and imminent. While the libellants are therefore entitled to compensation notwithstanding their character as pilots, no precise rule is afforded by that or any other case to fix the amount. What then is to be the compensation in this case?

II. The question of salvage, depending in all cases on the peculiar circumstances of each case, is subject to the legal discretion of the court. But in case of derelict, the merit is regarded as so great, the restoration of his abandoned property to the owner so entirely a clear gain, that the courts have established a very high rate of compensation with such uniformity, that, although the rule is admitted to be flexible, I should not be disposed under ordinary circumstances to depart from it. The general allowance has been of not less than one-third nor more than one-half of the entire value of the ship, cargo, and freight earned.

Was the Grace Brown derelict? I regard the law as well settled, that a mere abandonment of a ship on the high seas, with the bona fide intention of returning to her, when the impending peril shall have ceased, or the object of leaving her is attained, does not constitute the ship derelict. In the case of Rowe v. The Brig, [Case No. 12,093,] I do not understand Judge Story as contravening this doctrine. In the case of The John and Jane, 4 C. Rob. Adm. 216, Sir William Scott had intimated an opinion that if a vessel be captured and afterwards abandoned by the capturing enemy, it was not a case of derelict, because neither the owner nor those who were in possession as his agents had committed an act of dereliction. So that in this view there must be a voluntary abandonment by the master and crew. But "this opinion," says Judge Story, "has been silently retracted." If the abandonment shall be without the intention to return, it is derelict, whether voluntary or involuntary. In the case of The Aquila, 1 C. Rob. Adm. 37, Sir William Scott had held that a legal derelict is properly where there has been an abandonment at sea, without the hope of recovery. Judge Story adds that it might perhaps have

---

[3] There is error in this reference. The case cited is in 6 Rob. 92; but has no bearing upon the subject. [The case intended to be cited in the text is The Vrouw Margaretha, 4 C. Rob. Adm. 103.]

been more accurate to have said an abandonment without an intention to return. On various cases cited at the bar this rule has been acted on, and I regard it as settled. I have already said that in this case, on the proofs, the master of the Grace Brown at the time of leaving her with her officers and crew, intended to return to her, and, therefore, this is no case of legal derelict. The allegation of the libel to that effect is not sustained by the proof. The compensation to be made to the libellants then is for relief given to a distressed vessel at sea, and it is to be regulated by the principles already laid down. When the ship was anchored the wind was blowing on shore and the sea running high. While that state of things continued it does not appear to me that it would have been possible for the libellants to have relieved her. With their local knowledge on a favorable change of the wind they conducted her into deep water, with the high tide and the aid of her own sails. To them this was a duty involving comparatively no danger. Cole, one of the libellants, says that as the "weather then was," the vessels of the salvors were in no danger, and it is for the actual danger incurred that they are to be compensated. Neither the adverse gales which endangered the ship before they went to her, nor the southeastwardly wind which sprung up after the ship reached Norfolk, can enhance the pretensions of the salvors. Finding the ship at sea without any one on board, the libellants had just ground for believing her abandoned, and lawfully took possession of her. But I have not clearly seen the necessity of their doing so, nor am I satisfied that the ship would not have made this port in safety, under her own officers and men, if the salvors had not interfered, so that neither the peril of life or property to the libellants in the adventure, nor the benefit to the owners by their services, has been very great. It has, however, been urged on the court, and with great propriety, that the interests of commerce and an enlarged commercial policy require that a liberal compensation should be made for such services; I acknowledge the full force of these considerations. But it must be borne in mind, that while for extraordinary services beyond the strict line of duty, pilots may receive the extraordinary compensation of salvage, theirs is a profession of peril and adventure; that in the season of tempest and danger their services are most necessary to vessels seeking a harbor, without the local knowledge in their officers to conduct them in safety, and that no inducement should be offered to pilots to withhold their services in moments of peril, that when the ignorant mariner is placed in imminent distress they may rescue him from a situation which their timely aid would have averted, and then demand the extraordinary remuneration of salvors. They would cease to be the guardians of commerce, pursuing their useful but hazardous profession as pilots, and become its worst enemies, permitting its distresses and prospering on its misfortunes.

Upon the whole case the merit of the libellants is not of a very high grade; as their services though promptly rendered were not very arduous, nor attended with great danger to them; as the ship was not in great and imminent peril at the time they took possession of her, or while in their possession, and as the value of their services to the owners was not considerable, as the master and crew were returning to her, and might have saved her with no great risk or trouble if the libellants had not taken possession of her. But the libellants are entitled to a liberal compensation for their services, and for them, their risk and expenses, I award to them the sum of two thousand four hundred dollars, clear of legal costs. In the language of Judge Hopkinson in the case of The Elvira, [Case No. 4,423,] I know of no probable or plausible calculation on which I can suppose that these pilot-boats and those on board could have earned half this amount while engaged with the Grace Brown, and certainly they could not have earned it with less labor, risk, and expense. I make no order of distribution amongst the salvors, as neither the proof nor the libel enables me to do so, and I presume it can be arranged amongst them.