## Case No. 16,956.

### VIRDEN et al. v. The CAROLINE.

[6 Am. Law Reg. 222.]

Circuit Court, D. Delaware. Oct., 1857.

SALVAGE COMPENSATION — TUGS MAINTAINED FOR SALVAGE PURPOSES.

1. Where a steam tug is kept constantly employed during the winter, on a dangerous station, and at a heavy expense, for the express purpose of rendering salvage and towage service to vessels in distress, her owners are entitled to the full remuneration usually awarded to salvors who peril life and property, though the particular salvage service may not have been actually accompanied by much danger or labor.

2. A brig was caught and damaged in the ice in Delaware Bay, and, from the nature of her injuries, could only be rescued by the removal of her forward cargo. This was done (and it was not otherwise possible) by and with the assistance of a steam tug stationed at the breakwater. Part of the cargo thus removed was transhipped to the tug, and the brig afterwards towed by her into port. The court decreed to the owners of the tug, one-half the value of the cargo transhipped, and four per cent. of that of the vessel and remaining cargo.

[Appeal from the district court of the United States for the district of Delaware.]

This was a libel for salvage, by [Henry Virden and others] the owners of the steam tug America. and came up on an appeal from the decree of the district court. awarding the sum of $650 to the libellants for salvage services to the brig Caroline and cargo [case unreported], and from which decree the libellants appealed, upon the ground of inadequate remuneration. The vessel salved was lying at the breakwater, at the mouth of the Delaware Bay, on the first day of February, A. D. 1857, and upon that day the services were performed. The day following, the steam tug was obliged to go to New York for fuel, and upon her return, a few days afterwards, completed the salvage by towing the brig to New Castle. The vessel and cargo were valued at about twenty-one thousand dollars.

Rodney & Bayard, for libellants.

Mr. Bradford, for claimants.

TANEY, Circuit Justice. This is a claim for salvage, and the testimony in the case clearly establishes that the brig was in great peril, and was rescued from danger by the libellants. The only question open to dispute, is the amount of compensation to which the salvors are entitled. And this is one of those questions in which it is often so difficult to come to a satisfactory conclusion, and upon which different minds will often form different judgments. There is no rule of law, nor any fixed rule of judicial discretion, by which the compensation can be exactly measured. The principle is, that the salvor is entitled to an adequate reward, according to the circumstances of the case. But the material circumstances in each case will be found, in some respects, peculiar to itself, and to differ from all others. The peril in which the property is placed, its character and value, the danger and labors of the salvors, their expenses and skill, and sacrifices of time or money necessarily made, are all to be considered. and in no two cases are, perhaps, precisely the same. The sum allowed in one case can, therefore, furnish no precedent for a like allowance in another. And we can gather nothing more upon this question, from the reported cases, than the gen-

---

[1] [Reported by Hon. William Cranch, Chief Judge.]

eral policy by which courts of admiralty have been governed, and that policy undoubtedly is to deal liberally with salvors, in order to encourage exertions and sacrifices to rescue life or property from the dangers to which it must always be liable in maritime pursuits.

In the case before the court, the brig was evidently in imminent peril, and required immediate aid. She was at the breakwater, in the Delaware Bay, on the 1st of February last, exposed to the heavy floating ice with which the river was then filled. Her starboard bow or lumber port had been stove in, at the latter end of the ebb tide, by the heavy ice that came down the river, and it was absolutely necessary, for the safety of the vessel, that it should be repaired and strengthened before the next ebb tide; for the pilot on board of her (who is a witness called by the claimants) states that, if it had not been so repaired, the ice would probably have struck her bow port again on the next ebb tide, and sunk the vessel. The injuries it had already received made it incapable of resisting the blows and pressure of the heavy bodies of ice which came rapidly down the river when the tide was ebbing. The larger part of the injured port was under water, and the vessel was leaking from the injury, but not so badly as to cause any apprehension of immediate danger on that account. She was easily kept free by a single pump. But in order to repair the damage, and protect the vessel from the ice, it was necessary to raise her bow high enough to bring the whole port above water, and this could not be done without discharging a large part of her forward cargo. As soon as the pilot in charge of the brig discovered the danger, he applied to a schooner anchored near him to come alongside, and take off so much of the cargo as it was necessary to remove. But the master of the schooner declined complying with the request, saying that his own vessel was leaking, and he had but one anchor. And. upon receiving this answer, he immediately hoisted a signal of distress; and the steam tug came to his assistance. She was alongside of the brig as soon as she could make her way through the floating ice; and upon learning from the pilot the situation of the brig, the captain of the steam tug immediately placed ten hands on board to assist in lightening her by discharging her forward cargo. Her deck load forward, consisting of heavy hogsheads, weighing 1600 or 1700 pounds, and imbedded in ice on the deck, and on that account requiring great force to move them, were thrown overboard. Coffee and other merchandise were taken from the hold and placed on board of the steam tug; and portions of the forward cargo moved aft. By these means, the bows of the brig were in two or three hours raised so high that the whole of the port was out of water, and was then repaired and made safe under the direction of the pilot—the steam

tug laying by, at his request, until the work was completed, and the port made safe; and as soon as the river was in a condition to make it safe to do so, the brig was towed by the steam tug to New Castle in safety; and the portion of the cargo taken on board the steam tug at the breakwater, and which had remained on board, was delivered to the agent of the claimants. So far, then. as concerns the property saved, it was a case of imminent peril, in which a total loss of vessel and cargo would probably have occurred, with danger of life, but for the prompt assistance of the steamboat. And, judging from the whole evidence. the court is not satisfied that any part of the property rescued from danger would or could have been saved in any other way. It is true, the pilot of the brig says that, if he had received no assistance from any quarter, he could have saved the vessel and residue of the cargo, by throwing overboard, with his own crew, the deck load which was thrown over after the arrival of the steamboat, and also the goods and merchandise which were transferred to the steamboat; and that he would have done this with his own crew and boat, and then repaired the damaged port. But the weight of the. testimony is adverse to the opinion of the pilot. It evidently was essential to the safety of the vessel that the heavy hogsheads on the forward part of the deck, which contributed so much to press the bows of the vessel down in the water, should be removed. Her head would not rise so as to reach the injured part until this was done. And it appears from the testimony, that those heavy hogsheads were so firmly fastened to the deck by the ice, that there was great difficulty in moving them, when ten men from the steam tug were added to the crew of the brig, and all were united in the effort. The first attempt, even with all this force, failed, and they were obliged to resort to a different tackle from the one first tried, before the object could be accomplished. No attempt had been made to move them, until the additional force from the steamboat was on board; and the court is satisfied from an attentive consideration of the whole testimony, that if the attempt had been made by the crew of the brig, without any other aid, it must have failed. The captain had left her five days before the disaster happened. There was no one on board but the pilot, mate, three seamen, and the cook; and if with this comparatively weak force they had attempted, by sawing down the bulwarks, to put these heavy hogsheads overboard, the attempt would most probably have resulted in serious injury to the vessel, or to the persons engaged in the work. It is possible, and barely possible, that hands might have been sent in boats from the other vessels if there had been no steamboat to assist her. But if this had been done, it must have been done obviously at great risk of life and property. There were thirty-seven vessels in sight.

They were all more or less in danger from the ice when the tide was running, and no one could foresee at what moment the danger would come upon them. During the brief period of slack water, between the tide's, there were occasionally times when boats from some of the vessels might safely come to the brig. But no one could foresee how soon the floating ice might prevent their return, or render it exceedingly hazardous. Besides, every vessel was necessarily constantly on its guard, and might at any moment need the presence of its whole crew to save itself, and the pilot of the brig himself states the difficulties and dangers which would have attended relief in this mode from other vessels, and says that "every crew ought to be at home when the ice is running." The relief, therefore, if given by boats from other vessels, would have been at the hazard of the lives of those employed, and increased the risk of the vessels to which they belonged. No such relief was offered, nor is a single witness produced from any other vessel who says it could or would have been given. And the captain of the Powhattan, who came on board after he saw the steam tug alongside, thought it prudent to engage the steam tug to take him back to his vessel, in case the floating ice should block up his return, or render it hazardous to his boat. It is manifest, therefore, that if relief had come from boats dispatched from other vessels, the relief would have been afforded at such risk of life and property as would entitle the salvors to the most favorable consideration of the court in awarding them compensation. And even with all this hazard and risk, the property transferred to the steam tug must have been thrown overboard and utterly lost. For it was clearly impossible for any other vessel to have gone alongside of the brig. This fact is positively stated by the engineer of the steamboat, and he is fully confirmed by every witness examined from other vessels which were lying around her, and witnessed the whole scene. It took the steam tug, with all her advantages, one hour to reach her, although the distance was only about five hundred yards, and she was occasionally obliged to back from the weight and pressure of the ice in her way.

It is urged, however, by the claimants, that the steamboat encountered no danger, and consumed but little time in rescuing the brig and cargo from the peril in which it was placed. This is true. But it must be remembered that the steam tug had by the prudent foresight of her owners, and at a heavy expense, been prepared to render such services promptly and without much danger to herself or her crew. She was strongly built, well manned, and placed at the breakwater in the Delaware, where it was well known many vessels must be detained at this inclement season, and would be constantly in danger from the winds and the ice. She was kept there at a heavy daily expense, and with her crew constantly exposed to severe weather, but yet always in readiness to go to the aid of a vessel in distress. It is the well-established policy of courts of admiralty to remunerate liberally salvors who risk life and property, or suffer hardships in rescuing a vessel or cargo when in danger of perishing. And I cannot perceive any reason why a salvor should be entitled to less, who expends his money in preparing a vessel by which the service can be rendered with less risk, and keeps her at the place where danger is anticipated, at a heavy daily expense, in order that assistance may be promptly rendered when the emergency shall arise. The reason assigned for a liberal allowance in the one case, applies with equal force in the other. And, in my judgment, the salvors are entitled to the same measure of compensation that the court would have deemed just, if the vessel had been rescued by the boats of the surrounding ships, amid the hazards which such an enterprise on their part would evidently have brought with it. The situation of the America in this case was unlike that of a steamboat accidentally passing at the time of the disaster, which turns out of her way for a short distance, and delays her voyage for a few hours, in order to afford the necessary relief. Her sacrifice of time and labor would be small. But here was a daily heavy expense, and she was always prepared, at the point of danger when assistance was needed.

Entertaining these views of the case, I think the sum awarded by the district court is not an adequate compensation for the service rendered. I am aware, as I said before, that upon this question there is no certain and definite rule to guide the court, and different minds will unavoidably come to different conclusions. It is, therefore, the practice of the appellate court, where its opinion approximates to the one entertained by the court below, not to disturb its judgment, although it may not fully concur in the propriety of the sum awarded. But where it is otherwise, it is undoubtedly the duty of the appellate tribunal to decide the case upon its own judgment as to the rights and just claims of the parties. [Post v. Jones] 19 How. [60 U. S.] 160. And dealing with the case according to the conclusions of fact which I have hereinbefore stated, and the principles which admiralty courts have been accustomed to apply to such cases, I think that, for the portion of the cargo which was transferred to the steamboat, the salvors are entitled justly to one-half its value. This portion was destined to certain destruction, if the steam-tug had not been there, and come to the relief of the brig. For if she could have been saved by her own crew, or by boats from other ships, this part of her cargo must have been thrown overboard to lighten her near the bows, and it was evidently impracticable for any other vessel but a steamboat to come alongside and take it off. In cases of derelict, where there has been any hazard in saving it, the one-half has been most commonly allowed. And in this case the property could not by any possibility have been saved if this steam-tug had not been placed at the breakwater, and kept there

at the expense of the owners, ready to interpose the moment the brig hung out the signal of distress. It presents at least as strong a case for compensation as that of a vessel found abandoned at sea, for without the aid of the steam-tug the loss was not merely highly probable, but absolutely certain and inevitable.

As relates to the vessel and the rest of the cargo, I feel more difficulty in coming to a conclusion. They were undoubtedly saved by the steam-tug, and upon the principles already stated she is entitled to as high a rate of compensation as would have been allowed to the boats of the other ships. And taking all the circumstances into consideration, and the towage of the vessel afterwards to a port of safety, it appears to me that about four per cent. of the value saved would not be more than a fair and adequate compensation. I do not mean to rest this part of the opinion upon any rule of percentage applicable to cases of this kind. I look rather at the sum which that percentage will produce, and compare it with the value of the services rendered. Nor shall I enter into any nice calculation as to the precise amount which these allowances will produce. The judgment is necessarily founded upon estimates, and there can be no exact mathematical calculation fixing precisely the first amount. But looking to the whole case, in all the circumstances, as it appears on the record, I am of opinion that the libellants are justly entitled to seventeen hundred dollars ($1,700) as compensation for the salvage services rendered to the brig, and shall decree accordingly.