## Case No. 1,476.

BLAGG et al. v. The E. M. BICKNELL.

[1 Bond, 270;[1] 3 Wkly. Law Gaz. 393.]

District Court, S. D. Ohio. June Term, 1859.

SALVAGE — DANGEROUS POSITION — EVIDENCE — WRITTEN INSTRUMENT OF ABANDONMENT—RISK —FORFEITURE OF INSURANCE.

1. In a suit for salvage against a boat and cargo, a written instrument of abandonment signed by the officers of the boat, is admissible in evidence to prove the perilous situation of the vessel.

2. If a forfeiture of insurance results from a deviation in navigation made for the purpose of rendering a salvage service, it might be legitimately considered in fixing the amount of allowance to the salvors, but where no such consequence has followed, the mere possibility that it might have happened is a contingency too remote and speculative to enter into the computation.

[3. The rescue of a steamer grounded in the Ohio river, and in immediate peril of loss, is salvage service, whether the salvors risk their lives or not.]

[See Spenser v. The Charles Avery, Case No. 13,232.]

[In admiralty. Libel for salvage by Jefferson Blagg and others against the steamboat E. M. Bicknell and cargo. Decree for libellants.]

Lincoln, Smith & Warnock, for libellants.
Fox & Fox, for respondents.

OPINION OF THE COURT. This is a libel for salvage, prosecuted by the owners and navigators of the steamboat Ohio No. 2, against the steamboat E. M. Bicknell and its cargo. The facts on which the libellants base their claim for salvage are, briefly, that the Bicknell, then being employed in navigating the Ohio river between the city of Cincinnati and the town of Parkersburg, the latter place being in the state of Virginia, on February 21, 1858, was proceeding up the river, laden with a cargo consisting of one hundred and thirty hogsheads of tobacco, three hundred sacks of wheat, two hundred and fifty barrels of. flour, and some other articles of small value; and in attempting to pass up the channel, between Buffington's island and the Ohio shore, grounded on a sand-bar, near the foot of the island; and while aground, the boat was turned by the force of the current, which was strong, nearly square across the channel, its bow being towards the Ohio shore. The weather was excessively cold, and the channel was covered with thick, heavy, floating ice, which was rapidly increasing, and which, while the Bicknell lay in the position before described, struck with great force against its upper side, and had gorged about the middle of the boat, and was thrown up nearly as high as the guard. The officers and crew of the Bicknell had labored incessantly for about twenty-four hours to relieve the boat

[1] [Reported by Lewis H. Bond, Esq., and here reprinted by permission.]

from its exposed situation, but wholly without success. In the evening of the next day, after the Bicknell had grounded, the Ohio No. 2, then running as a freight and passenger boat between Cincinnati and Marietta, in its downward trip, succeeded in passing down the channel between the stern of the Bicknell and the shore of the island, and at the request of the master of the latter boat, stopped and made fast his boat at the lower end of the island. The master of the Bicknell went on board the Ohio soon after, and requested the assistance of the latter boat in relieving his boat from its perilous situation. Capt. Blagg, the master of the Ohio, after consultation with the officers of his boat, refused to aid the Bicknell unless the boat and cargo were first formally abandoned to the officers and crew of the Ohio. This arrangement was assented to, and a written instrument of abandonment was signed by the master of the Bicknell, in which the other officers concurred in a separate writing. In pursuance of this arrangement, about eight or nine o'clock in the morning of the 22d of February, the Ohio was navigated with some difficulty up the channel to the Bicknell, and was made fast by lines to the stern of that boat and the shore of the island. In this situation, the officers and crew of the Ohio proceeded to lighten the Bicknell by the transfer of so much of its cargo as the Ohio could safely take, which the latter boat conveyed safely to, and landed on the shore at Ravenswood, some three or four miles below. The Ohio then returned to the Bicknell, and after taking a part of the remaining cargo succeeded in pulling the boat from the bar on which it was aground, towed it safely to Ravenswood, and replaced on it the part of the cargo which had been removed. The Ohio, with its officers and crew, was occupied in this service from eight or nine o'clock in the morning until ten or eleven in the evening, being in all about fourteen hours.

Without reference to the written abandonment, before noticed, and the protest signed by the officers of the Bicknell, the evidence leaves no room for a doubt that that boat and its cargo were in imminent peril when relieved by the libellants. It was so hard aground that there was no possibility of getting it afloat without taking out a large portion of its cargo. From its position, and the force with which the ice was striking it, the destruction of the boat and the loss of the cargo seemed inevitable. But any possible doubt as to the peril of the boat and cargo is removed by the terms of the written instrument of abandonment, which is in evidence before the court. This paper, after describing the situation of the Bicknell, substantially, as already stated, and reciting that every effort had been made to relieve the boat, without success, sets forth, "that unless said boat is speedily relieved from her present perilous situation, that the ice will

sink her, and thereby destroy both boat and cargo, and seeing no means of relief, I, for myself as captain and part owner of said steamboat, and as the agent of the other owners, underwriters, and whoever it may concern, hereby abandon to J. J. Blagg, and others, the said steamboat, E. M. Bicknell, and her cargo." At the same time the officers of the Bicknell signed a protest, which states, in nearly the same language contained in the abandonment, the extreme danger of the boat, as their reason for, and vindication of, the course they had adopted.

The service rendered by the libellants was a salvage service, beyond all question; and the only inquiry in the case is, what amount of compensation shall be awarded to the salvors. On this subject there is not, and cannot be, any fixed or invariable rule. Every case must necessarily depend on its peculiar circumstances. It has been recognized as a rule founded in sound policy, that salvage services should be so liberally rewarded as to afford encouragement to engage promptly, and even at great personal sacrifice and hazard, in saving property and life endangered by the perils of navigation. Courts of admiralty have, however, held it to be an indispensable element of a salvage service, that the danger to the property rescued, should have been actual and not speculative merely. This fact being satisfactorily established, there are other considerations which will affect and control the amount of the allowance. The value of the property saved, the promptness and energy with which the salvors have interposed, the hazard of life and property which they have encountered in the service, and the duration and arduousness of their labors, are proper elements in fixing the amount of remuneration.

In this case, the value of the Bicknell may be set down at $10,000, and the cargo at about $9,500. The libellants claim an allowance of twenty-five per cent. on these amounts, making $4,875. I am unable to perceive, from any view I can take of the facts of this case, any just ground for this large compensation. There is certainly nothing in those facts justifying the conclusion that these services place the salvors in the highest position of merit. Their interposition did not result from any generous impulse or desire to do a good act to a fellow creature in distress, but from a cool calculation of the profit to inure to them as salvors. They refused their aid unless the periled boat and cargo were first abandoned to them, so as to place their claim for salvage on an indisputable footing. It is true, the abandonment was the voluntary act of the officers of the Bicknell, and by their own admissions, was the best that could be done under the circumstances. And while it is no answer to the claim that this was a salvage service, it may well be regarded as detracting from its merits as such, and is

entitled to consideration in determining the amount of remuneration.

The case also lacks another element, which, when found in a salvage service, will always enhance the amount of the allowance. It is not claimed by the libellants—nor does the evidence warrant the conclusion—that the salvors in their interposition incurred any hazard of life, or other personal injury, except what ordinarily pertains to such service on the western waters. Nor was the labor performed peculiarly exhaustive or arduous. It consisted in the transfer of a part of the Bicknell cargo to the Ohio, placing it on the bank of the river at Ravenswood, and returning it again to the Bicknell. While this labor required a good measure of muscular effort, it certainly involved no extraordinary hardship or suffering. It was performed mostly by daylight, and the time occupied did not exceed fourteen hours.

But, as before stated, the service rendered by the libellants was a salvage service, and was important and valuable to the owners of the Bicknell and its cargo. Both the boat and cargo were in imminent danger. The evidence well justifies the conclusion, that but for the interposition of the libellants they would have been wholly destroyed or rendered nearly valueless. It is also clear of doubt that in the performance of this service the Ohio and its cargo were to some extent put in peril. The exact degree of this peril cannot be readily determined from the evidence. But the position of the Ohio while taking on board a part of the Bicknell's cargo, and the force with which the ice was brought against it by the rapid current, leaves no room to question the fact that there was a hazard much greater in degree than that to which the Ohio would otherwise have been exposed. It is also in proof, that by reason of the intervention of the libellants, the Ohio was thrown out of place in the line of packets of which it was one, and thus subjected to expense and loss of time.

The considerations to which I have referred are entitled to weight in deciding upon the amount of compensation to be awarded. And I am not disposed to measure the sum to be allowed with great strictness. Although there is some evidence to show that one thousand dollars would amply remunerate the libellants for their services, the facts justify a more liberal allowance. I think that fifteen per cent. on $19,500, the estimated value of the boat and cargo, will be a fair compensation to the libellants. I am the more inclined to adopt this rate from the fact that the owners of the cargo have paid the libellants, and they have accepted this percentage on the cargo. This, it is true, was in the nature of a compromise, and not conclusive on either party as fixing the rate of compensation. But it is an admission by the owners of the cargo that they deemed the libellants entitled to the percentage paid for

the service rendered. Fifteen per cent. on the valuation of the boat and cargo amounts to $2,925. This sum is, however, subject to a deduction of $1,421, the amount paid and accepted as above stated, which leaves about $1,500 to be paid by the owners of the boat. For this sum a decree will be entered.

In thus fixing the rate of compensation to these salvors, I have not overlooked the reason urged as a ground for a largely increased allowance, namely, that the service rendered involved the hazard of a forfeiture of the insurance effected on the steamboat Ohio, and its cargo. It is insisted that this was such a deviation from the ordinary course of navigation, as that the insurers were thereby released from all liability on their policies. And the principle seems well settled by the cases referred to, in regard at least to the navigation of the ocean, that a deviation for the mere purpose of saving property where human life is not involved, will forfeit the policy of insurance. To what extent this doctrine is applicable to insurances of boats on western rivers, it is not necessary in this case to inquire or decide. Here was no actual loss or injury to the libellants, from their intervention in behalf of the respondents, except the loss of time, and the expense incident to the detention of the Ohio. And I can see no principle on which the possible forfeiture of the insurance can form a distinct element in determining the value of the salvage service. If a forfeiture had resulted from the deviation, it might be legitimately considered in fixing the amount of allowance to the salvors; but where no such consequence has followed, the mere possibility that it might have happened, is a contingency too remote and speculative to enter into the computation.