## Case No. 11,914.

### ROBERTS et al. v. The ST. JAMES.[1]

District Court, S. D. Florida. April 11, 1872.

WITNESS—INTEREST—ADMIRALTY — SALVAGE—LICENSED WRECKERS — MERIT — FALSEHOODS — MASTER'S PROTESTS.

[1. In admiralty, interested parties may testify, but their testimony relating to what can be construed into their own misconduct should be received with suspicion.]

[2. Licensed wreckers are entitled to greater compensation, and charged with a higher degree of care and skill, than other salvors.]

[3. A salvor who shrinks from imperiling his person and property greatly lessens his merit thereby.]

[4. Saving a cargo in midwinter by diving in the hold of the wreck on an exposed reef, far from land, is salvage service of great merit.]

[5. Falsehood by salvors touching the amount of cargo saved by especially meritorious service should diminish their compensation.]

[6. A licensed wrecker who proceeds in opposition to the master's protests is liable in an extraordinary degree to forfeiture of all compensation for anything short of final success.]

[7. Delay by salvors in bringing their vessels to the assistance of a wrecked ship, while each strives with the other to be the first to board her in small boats, and their use of insufficient tackle and inadequate means to get her afloat promptly, are evidence of such gross and willful negligence as merits the forfeiture of all compensation.]

[8. The master of a wrecking vessel, by countenancing a wrongful injury to a wrecked vessel by one of his crew, and by falsely denying knowledge thereof, forfeits all right to salvage.]

[9. A salvor, by his failure to bring in and report salved property, though it be of little value and abandoned as worthless, forfeits all rights to salvage as against other property saved by him.]

[10. Salvors, by wrongfully burning a wrecked vessel, forfeit salvage on the cargo saved by them.]

[11. All salvors present when one of their number is guilty of willful wrong to the property are liable to forfeiture of their compensation if the wrongdoer cannot be discovered.]

[1] [Not previously reported.]

[12. When the compensation of certain salvors has been forfeited for misconduct, it rests in the discretion of the court to determine what interest shall be benefited by the forfeiture.]

[These were libels for salvage by William S. Roberts and others against the American ship St. James.]

LOCKE, District Judge. This ship, laden with 1,500 tons of railroad iron, bound from Cav. to New Orleans, went ashore on a point of the Florida Reef known as Couch Reef, at about 7 o'clock p. m., of Nov. 16th, 1871. She headed S. by W. ½ W. when she struck, and gradually swung round until she headed N. N. W. She was drawing 20 ft. 5 in. forward, and her bows rested on a boulder in about 18 ft. of water, it gradually deepening aft, until at the stern there were about 30 ft. This shows briefly how the ship was fast, and where the shoal, and where the deep water. Soon after she struck, three wrecking vessels went to her assistance, or rather started, but anchored inside the reef between her and the shore, and the masters went to her over the reef, in their small boats, arriving there at about 10 o'clock. Between 12 and 1 o'clock the next morning, they made and signed an agreement to get the ship off for such a sum; and the wrecking masters immediately sent boats to bring out the schooners, and one boat to put a light at the end of the reef, so they could see how to come around it. This boat returned, the master saying it was so rough, that he could not find the end of the reef. The next morning, between 7 and 8 o'clock, the schooners came out, took out a kedge and a stream anchor, with hawsers attached, and carried them out in a S. E. direction, or nearly astern. Upon heaving upon them, the stream anchor would not hold, but came home, and the line to the kedge was too small for any purpose. When the stream anchor would not hold, they took out the starboard bower anchor, with 15 fathoms of chain attached, and took up the stream anchor, made fast the hawser which had been attached to that of the bower anchor, and commenced loading the schooners with iron of the cargo-loaded four vessels; but, at this time the hawser parted, the vessel which had been hove up about a point and a half surged back on the reef, parting the line to the kedge, and lay with nothing to relieve or assist her, and, as the libellants say, the wind blowing heavy and much sea on. This was about midnight. Nothing more was done until next morning, when they carried out 60 fathoms more of chain, made it fast to the chain already fast to the anchor, and, not having chain enough, fastened a six inch hawser to the chain, and commenced heaving as much, they say, "as the hawser would bear." But this tide was ebbing, the ship hard and fast, and the water gaining rapidly, until at length it was conceded by all, that it was useless to make further attempts to get the vessel afloat, and

they ceased their efforts. The next morning, they went to work stripping the ship, and brought the material to Key West.

I have been thus particular in going over the several acts of the wreckers, and their conduct, as herein is their claim to salvage, and herein, also, is the principal defense thereto. The whole question, or the main question in this division of the case, is: Was the conduct of the libellants, in their endeavors to get the vessel afloat, such as could be reasonably expected of them, and sufficiently in good faith, and free from fraud or gross or wilful neglect, as would authorize them to claim salvage? or was it such as to work a diminution or forfeiture of salvage? As the wreckers on this coast are known and recognized as professional wreckers, acquainted with the business, and as such receive higher compensation than ordinary salvors; as they ask licenses, and, by becoming licensed, hold themselves out to ship masters as recommended by this court, it is but reasonable that they should be held to a more strict accountability in the performance of salvage service than one who made no special claim to experience or skill (Marv. Wreck & Salv. p. 176, § 160); as one who represents himself as a skilled artizan or mechanic becomes liable for an abuse of confidence placed in him, where another who tendered his services without such special claim does not. Salvage service is supposed to be rendered where there is peril, and salvors are not presumed to shrink from any slight degree of danger. Indeed, one of the principal ingredients of a salvage service is the degree of peril to which a salvor exposes himself and his property. Remove this peril entirely, and a great proportion of the claim is stricken out. True, the amount of risk which he will accept is for him to determine; but he must recollect that that which is accepted is to be considered in the measure of the merit of their services. If salvors do not choose to accept risks and encounter perils, they must not expect to receive rewards compensating them for encountering such perils.

Let us examine, briefly, the conduct of the libellants in connection with this ship. The masters of the three first vessels all saw the ship strike before dark, and immediately started to her assistance. They knew that they could render no aid by themselves without their vessels, yet so eager were they, not to render assistance, but to get on board before some one else, that they all left their vessels at anchor from a half to three-quarters of a mile from her, and with small dingy boats pulled over the reef to get on board. This, even, when they left their vessels on the windward and exposed side of the reef, and when, according to the testimony of numerous experts, it would not have taken more than half an hour more to have brought their schooners out to the ship. This undue haste necessitated the sending for their vessels after they had made an agreement,

but with no favorable result, as they did not get under way until after daylight the next morning, and did not arrive at the ship until between 7 and 8 o'clock, thereby losing much valuable time, and time that would have enabled them to have had a heavy anchor and chain carried out by the next high tide. The libellants allege that it was impossible for them to come out around the reef that night, as they were unable to place a light at the point of it; but it has been fully proven that there is a channel at a short distance of from 12 to 14 feet of water from a mile to a mile and a half wide, and it has constantly been the practice of wrecking vessels to go out through this at all times of night, without deeming it hazardous. In this I consider that the wreckers shrank from accepting a slight risk, and certainly such conduct at once withdraws one ingredient of salvage.

Upon arriving at the ship, the wreckers proceeded to take out two small anchors, a stream and a kedge. There is much conflicting testimony upon this point. The libellants declare that they were obliged to take them out on account of lack of men, as the captain said that the crew of the ship were tired, and that he thought those small anchors were large enough. On the other hand, the master says that he protested against their taking out the small anchors, and insisted upon taking out the bower and chain, that they might have something that could be depended upon; said that if they would let him have a vessel, he would take it out himself, but that the master wrecker insisted upon carrying out the small anchors first and waiting awhile; and that all hands were called up from their work on the iron to help out the stream and kedge anchors on the schooners. This is the master's story. The mate says that he protested against taking out the small anchors, saying that "he didn't believe that they would move the ship if she was afloat"; that he also heard the master insisting upon their carrying out the large anchor, and Capt. Roberts, the master wrecker, saying that "he couldn't get any vessel to take it; that they would back the stream anchor by the kedge." Now, where there is such a conflict of testimony, in order to get at the truth the court is bound to take into consideration all attendant circumstances, and, where the question relates to the conduct of a certain party, to inquire what the probabilities, judging from known facts, are in regard to his conduct on that particular occasion. The question of interested witnesses is also to be well weighed, and although, in admiralty, interested parties, ex necessitate rei, are permitted to testify, their testimony, where it relates to what can be construed into their own misconduct, should be viewed with great suspicion; and where confirming evidence can be introduced, and is not, the absence of such supporting testimony will weigh materially against re-

ceiving that of the interested party. The Boston [Case No. 1,673]. True, it is claimed that in this case all are interested parties,— on one side pecuniarily, on the other in their reputation and standing; but the evidence of one is entirely unsupported, the other cumulative. Let us inquire, now, what we should expect of the master of a ship in the condition of this one, who had had his men at work constantly all night moving iron, as an incidental step towards the relieving of his ship, at the time when the carrying out of an anchor, which is to result in the preservation or destruction of his ship, is to be attempted? Is it reasonable to believe that he would so suddenly become so careful and considerate of his men as to object to their assisting, or so careless as to the welfare of his vessel as on their account to jeopardize her; and particularly when we find that, at this very time, the crew were called up to assist in putting the light anchors on board the salving vessels?

We can, therefore, but believe that it was not only without the consent of the master, but in spite of his protest, as well as of the mates, that the small anchors were carried out. The next question was in what direction to carry them. In this matter there was a difference of opinion which is acknowledged by the salvors, and there is no conflicting testimony. Referring again to the direction in which the ship went ashore, and the manner which she had swung, we see that at this time she was lying with deep water all along her starboard side, sufficiently deep to float her, as she had swung over it since she had struck. The shoalest water was directly under her forefoot, and, as Capt. Roberts testified, her bows rested on a boulder. The rest of the distance, where she was on the botten at all, she must have been ashore on the port side, only as much as she had swung against the bank.

In this case, instead of attempting to drag the ship along the reef resting as she did on the bank, a third or perhaps a half her length, she should have been swung back, and relieved as far as could be from the bottom, and pulled off in the direction in which she went on; and this could have been done only by a strain directly off the quarter sufficient to swing her at right angles with her present position. It was soon found that the stream anchor which had been carried out would not hold, and again the master wrecker was appealed to to carry out a bower anchor. Capt. Patterson says he talked to several of the other masters, and that none of them would take it out, until the master of a vessel but little more than half the size of the Vance (the vessel of the master wrecker) volunteered to do it on condition of being admitted to the consortship; and then they would take out but 15 fathoms of chain, though requested to by Capt. Patterson, and proceeded to take up the stream anchor, the only thing which relieved the

vessel from the bank at all, and left her broadside exposed to the wind and sea, with nothing out but a kedge to hold her off. When appealed to by Capt. Patterson to carry out chain enough to reach the ship, he said that 15 fathoms of chain was enough,—all that was required to clear the law,—and insisted upon making fast the hawser which had been taken up from the stream anchor to the 15 fathoms of chain to the bower anchor, and hove as heavy chains as it would bear until they succeeded in swinging her about a point and a half, when they proceeded to lighten the vessel by discharging iron, on the salving vessels; but at about 11:30 or 12 o'clock, both hawsers parted, and she swung back to her original position. The next morning they attempted to carry out chains, and accidentally lost one end, but at length managing to recover it, they attempted again to heave the ship afloat by attaching to the chain a six inch hawser. Were it not for the sad and disastrous consequences, it would seem most absurdly ridiculous to see a company of seafaring men —licensed wreckers, who held themselves out as qualified and competent—attempting to heave a ship, hard aground, with 1,800 tons of stone and iron in her, afloat with a six-inch line, after they had parted a twelve-inch hawser in the same service.

The libellants have attempted to explain that they could not bring the chain on board the vessel, as it would cut down through the bulwarks; but this was an excuse which seems not to have been mentioned on board the ship at the time, and is one that amounts to nothing in itself. In a ship with a plenty of spare spars and bars of iron, that could without any difficulty be used to protect the quarter, it seems to me that the excuse shows a lack of energy and skill not at all complimentary to him making it. And it does not appear that there was any attempt made to bring a chain on board at all. It is no excuse for the wreckers if anchors drag, as they should use heavier ones or back them with kedges. If hawsers break, they should resort to chains, and, in large vessels, chains should always be resorted to, and hawsers should not be relied upon; and, if an anchor is planted on the quarter, an opening may be made on the bulwarks, through which to run the chain. Judge Marvin says: "Whenever wreckers have the management of the business, and they fail to get a stranded vessel afloat at the first high water, at which she might have been floated had they employed the proper means, they must be considered as having failed in skill and energy, and must suffer the just and legal consequences of such failure." The Diadem [Case No. 3,874], 1857. It is a well-established principle of admiralty law that "gross negligence or carelessness in rendering salvage service, being a species of fraud, works a forfeiture of salvage." Marv. Wreck & Salv. p. 233, § 223. Also, "where

negligence is gross or wilful, salvage should be wholly forfeited." Id. p. 113, § 106; The Neptune, 1 W. Rob. Adm. 298; The Duke of Manchester, 2 W. Rob. Adm. 470; The Joseph Harvey, 1 C. Rob. Adm. 306.

Admitting, as I must, such to be the law, the only question now is, have the libellants in this case been guilty of gross or wilful negligence? If the reply is in the affirmative, there is but one decision to be arrived at, no matter how much I may regret the necessity of such decision. Had the libellants, the first morning of their arrival, carried out a bower anchor and sufficient chain to have reached the ship, in the proper direction to have brought the vessel back to the position in which she went on, I consider they would have been doing their duty; but in neglecting to do this they were guilty of negligence, and especially was it wilful when it was in spite of the protestation of the master and mates. More particularly do I consider it gross negligence to take up an anchor, the only one that was out to prevent the vessel's driving broadside on against the reef, and especially most gross and wilful negligence when, having parted a twelve-inch hawser, with an abundance of chain and a sufficient number of men and vessels at their command, they made fast to and attempted to heave the vessel afloat with a six-inch hawser. To this negligence I attribute the final loss of the vessel. The negligence can but be considered gross when committed by men claiming to be professional wreckers; and it having been in direct opposition to the expressed desires of the captain, and in spite of his protestations, it must be considered wilful. It is not the intention or design of this court either to authorize or instruct the wreckers of this coast to take charge and command of a vessel in distress as against the master, but rather to advise, counsel, and assist; and if a wrecker does proceed in opposition to the master's expressed desires, and in spite of his protestations, he takes upon himself the sole responsibility, and is liable, in an extraordinary degree, for anything short of final success.

I have carefully considered whether the interests of the two sets of wreckers in the case—those originally arriving at the wreck, and neglecting to take out a large anchor, and those that arrived subsequently, and consented to take it out—might not be separated, as in the case of The Neptune, and the negligence of a part not visited upon all. But when we consider that the stream anchor was taken up, the hawser removed and made fast to the bower anchor when a chain should have been carried out, and at length a six-inch hawser was finally put in to bear the entire strain of the vessel between the capstan and the chain, after the arrival of the second set, and apparently with their consent, I can but conclude that there was gross and wilful negligence through the en-

tire service, and the legal consequences must fall on all alike. The libel of Wm. S. Roberts et al. must, therefore, be dismissed. In dismissing this libel, I do not intend to say or imply that I consider that any of the libellants acted with intentional bad faith, or dishonest purposes so as to taint any valuable service subsequently rendered, but that the services rendered the ship were grossly inefficient, and not deserving reward. All minor matters connected with this libel, and dependent upon it—namely, the charge of a non-delivery of a certain number of blocks, the petition of libellant setting up a removal and concealment of portions of the property saved, and the petition of tne owner asking to be remunerated from the salvage for wages paid the crew—are carried out by its dismissal; but the costs herein accruing will be paid from the property saved.

The subsequent libels against the cargo, and a small proportion of the materials saved by the B. & J. Baker, remain to be considered. Of the entire 1,500 tons of cargo, all have been saved, brought to this port, and delivered to the claimant, with the exception of about twelve bars, and nearly all in a good condition. The labor of saving it was most arduous, and was accompanied with much danger. Of the 1,500 tons, 975 were taken from under water, some of it from the depth of fifteen or sixteen feet. All of this was dove up by diving in the hold of the ship, where the water came just under the deck, without diving apparatus of any kind. Many of the wreckers labored for weeks, through midwinter, on an exposed reef, six miles from land, saving a cargo of the heaviest material, the pieces of which, with a very few exceptions, weighed 510 pounds; and this, diving in the hold of a ship, the water impregnated with iron rust, and with a deck resting like a sheet of ice on the surface, with only the hatch-ways and two or three holes in the deck where they could come up. It is difficult to imagine a salvage service of more labor. Was the only question a question of how much salvage has been earned by the wreckers, with the established precedents before us, it would be but a simple and easy matter to settle; but other issues have been brought in that call for further deliberation.

Let us consider, first, the rate of salvage which should, in justice, be decreed. The case of The Helen E. Booker [Case No. 6,-330], decided in this court in 1857, has been cited and relied upon as a parallel case establishing a just precedent. I have examined that case carefully, and every remark of the learned judge in the opinion given therein applies equally to this. "It is a disastrous wreck to the owners and underwriters, and not profitable to the salvors, for the salvage the court is obliged to give in order to compensate the salvors for their work and labor simply will leave but a small proportion of the savings to the owners and underwriters. The ship lay upon an exposed reef, where it was difficult and dangerous to lay alongside to get the iron out of the wreck. Two-thirds of it was under water, and had to be dived for, piece by piece; and the whole service has been laborious, protracted, and performed by a large number of salvors." The Helen E. Booker [supra]. Setting aside the conduct of the first set of salvors, who attempted to relieve the vessel, and who, in the case of The Booker, labored with a degree of energy, skill, and perseverance, which puts to shame the conduct of those in this case, and which would, in my opinion, have relieved the St. James in an undamaged condition,—I say, setting their conduct aside, and looking only at the question under consideration, namely, the saving of the cargo, the cases are so nearly similar that I can but accept that of The Booker as a precedent. If there is any difference, this case is decidedly the most favorable for the wreckers.

In the case cited, the service was performed in July; in the one under consideration, in November, December and January. In that, the extreme depth of water was about ten feet; in this, fifteen or sixteen. In that, a great part of the iron was saved after the vessel had been burned to the water's edge; in this, it was nearly all saved under decks. In that, each bar weighed but 373 pounds; in this, 510. In that, as in this case, a great portion of the cargo was saved by new parties, who had gained neither credit nor discredit by services rendered the ship when first ashore; and there the judge made no discrimination in rates of salvage between their services and those of the first salvors, showing conclusively that the salvage therein was not, as has been claimed, a high rate given as a reward for strenuous efforts made to save the ship. Although, in fixing salvage rates, courts may not be bound to the same extent by precedent that they may be in positive questions of law, yet, unless some good reason presents itself to justify a departure from the rates heretofore given in this court, I shall endeavor, as nearly as I may, to follow such previous decisions; and examining this case in connection with the one cited, I can see no reason why the salvage in that case was excessive, or why the rate should be decreased in this. In that case the rates were fifty, sixty-two, sixty-five, and seventy per cent. of the gross appraised value, according to the part of the vessel from which it was saved, and the labor in saving. I cannot deem those rates unreasonable, and, were it not for one thing, I should even increase the rate on the portion of cargo saved from the lower holds under the beams in from fourteen to sixteen feet of water. The mate who had charge of stowing the cargo testifies that in this part of the ship there were 150 tons of the iron, and I am well satisfied of the truth of this statement; but the salvors have returned and reported as taken from there about 300 tons. Could this discrepancy be traced directly to the party making the exaggerated statement, it would be viewed as an attempt to obtain an unjust ad-

vantage by false representations, and visited by a direct diminution or forfeiture of salvage; but, as that is impossible, it must rest upon all engaged in the transaction. Were it not for this false report, I should not have considered seventy-five per cent. an unreasonable salvage on that portion, but it must be diminished certainly as much and somewhat more than the actual difference would be.

Upon mature deliberation, I consider that forty per cent. of the sales of the materials saved by the B. & J. Baker and Planet Mars and small lots of iron works saved by small boats and the Rebecca, fifty per cent. of the appraised value of the iron saved from between decks, sixty-two per cent. of that saved from the lower hold below the beams, would be but a reasonable salvage. This will pay the salvors for but little more than their actual labor and the time occupied, while for the peril encountered, especially by those diving, they receive but slight compensation. The largest shares are received by the crew of the Sea Bird, who made six trips to the wreck, and labored constantly about nine weeks in the service, during which time one of them came near losing his life by drowning while diving, and lay insensible for hours. These men share about $150 apiece; the other shares are smaller, many receiving but twelve or fifteen dollars.

Thus far the original and the several subsequent libels against vessel and cargo, both in the hearing and consideration of the court, have been taken together through the connecting link of the common property proceeded against, but now we are called upon to take up separate interests, and examine questions touching matters other than the amounts of salvage.

In the several answers made by respondent, in addition to contesting the quantum of salvage, charges of cutting holes in the ship, cutting away one of the masts, embezzlement, and finally the burning of the ship herself, are made against the salvors. In considering the questions raised by these charges, I shall separate the interests as far as possible, and let the consequences rest alone upon the wrong-doers as far as can be ascertained.

In the question of cutting holes in the side of the ship to remove iron, much conflicting testimony has been given; some alleging that it was with the consent of the mate, then in charge of the vessel, and that they were cut to facilitate saving cargo. This the mate denies; but he being an interested witness, screening himself from an accusation of what may be construed to be wrong, his testimony must be taken with the allowance to be made in such cases, and with the preponderance of the testimony of disinterested parties in proof of his consent, I do not deem it justifiable to forfeit or diminish the salvage of libellant Morgan, who, it is admitted, cut the holes, as I should have done had no authority been granted.

After the ship had been left by officers and crew, and apparently abandoned, but while the wreckers were saving iron from her, the main mast was cut away, although it has been impossible, by any testimony introduced, to trace the act to any particular person. It is stated, though, that the top mast was left dropped part way down the main mast, and, there being no shrouds or stays, the men were afraid to work under or near it, for fear it would fall when the vessel rolled. I cannot believe this to be the true reason for its being cut away, or, at any rate, a sufficient reason, and the perpetrator should be held liable. Kemp, the master of the Barkalow, says that he saw a man cutting at it, but he didn't know rightly who it was; while it is proven by other testimony that it was one of the crew of the Barkalow. It is my opinion that, it being one of his crew, he was not only aware of the fact, but either directed or countenanced it. This, together with his prevaricating statement, cannot be overlooked, and his shares must be forfeited.

The next question is in regard to the alleged embezzlement of the stove. It was proven, and subsequently admitted, that this was taken away by Sawyer, the master and owner of the schooner Ada, and carried ashore, and, although not concealed, neither brought to this port nor reported. It has been put in evidence that the stove was comparatively of no value, and utterly abandoned as worthless; but the salvor who takes possession of wrecked property becomes responsible, and its conversion to his own use, without regard to its value, affects his whole connection with the property to a degree that cannot be overlooked. The Blaireau, 2 Cranch [6 U. S.] 240; The Bello Corrunes, 6 Wheat. [19 U. S.] 152; The Boston [Case No. 1,673]. The shares, therefore, of Sawyer, both as master and owner of the Ada, and of those with him at the taking away of the stove, earned during the entire service, must be forfeited.

It has been alleged that other materials were taken from the ship which have been unaccounted for; but such embezzlement has not during a long and searching examination been traced to any one or any set of salvors.

After the salvage service had been completed nearly, while the schooners Sea Gull and Ellen and a small sloop boat were lying by the ship, the crew of the Sea Gull and Ellen, some of the men from the Ellen, on board saving iron from the cargo, the vessel was discovered to be on fire, in the cabin aft. It is stated that all on board were at that time below decks, and, before the alarm was raised, the fire had made such headway that they had to make every exertion in order to get their vessels away from the burning ship, and could therefore make no attempt to extinguish the fire or discover the cause of it. It has been impossible to trace the fire to any individual, or in any way confine it to, and fasten it upon,

the guilty party. The crew of the Sea Gull and those of the crew of the Ellen here, as well as those on board the boat, have each made oath, denying all knowledge of the cause of the fire or its origin. Without denying the truth of the statement of any one herein, the question of presumptive and circumstantial evidence as against the testimony of interested parties in their own behalf presents itself. The idea that the fire could have its origin by any means except by an incendiary cannot, under the circumstances, be for a moment entertained. The vessel had been stripped, the skylights removed, the interior of the cabin exposed to all the rains of the season, and no fire known there for about two months. The fire must have been intentionally kindled by some one on board about that time, and there is no evidence that throws suspicion upon any one of the salvors present more than any other. I am as well convinced that the ship was fired that morning by one of the salvors present as I am that she was burned at all; and, although I may feel that there were innocent parties among those salvors, can I declare that they are in court with clean hands and entitled to compensation?

How far the misconduct of one salvor may rightfully be held to prejudice the claims of his cosalvors is not, in all cases, easy to determine, and particularly in this case. The several vessels at the ship come in under separate and distinct interests. But all on board the ship that day were virtually in charge and custody of the property, and by this they had a common interest in its protection and preservation, and although "the courts endeavor to discriminate between the innocent and meritorious, and the guilty and worthless, rewarding the one and punishing the other, yet there are cases of joint or associated service, in which the facts cannot be so ascertained that this discrimination can be made consistently with either sound policy or justice, and the innocent salvor must be made to suffer for the misconduct or neglect of his cosalvors." Marv. Wreck. & Salv. 227. 228; Nickerson v. The John Perkins [Case No. 10.252]; Spurr v. Pearson [Id. 13,268]. Vide The Island City, 1 Black. [66 U. S.] 131. In this case I consider that the guilt of burning the ship rests upon those present at the time; and in the absence of any proof enabling the court to separate the guilty from the innocent, and in view of the community of interest by their being in charge jointly and in common, all must be held equally liable.

In this condition it is contended in behalf of the libellants that, in a salving service, misconduct of the salvors, in connection with any property other than that brought to the notice of the court by their claim, cannot be taken into consideration to effect their salvage; and in this case, the parties at the ship at the time of the burning being libellants of the cargo only, misconduct toward the vessel could not affect them. This point has been ably argued, but I have been unable to find any cases or decisions touching it; and without going into the consideration of the general principal involved in this question, upon examination of it as connected with this case, I do not find the interests, as set forth herein, sufficiently separate and distinct to admit its application. The property in this case has been claimed by one person, and there is nothing in the case to prove different ownership or separate interests sufficiently to permit such a defense to be set up. There had never been a separation of the cargo libelled by them from the vessel. either actually or constructively; and most certainly I am not willing to say to salvors that in such cases they may burn the vessel and obtain salvage for bringing in the cargo, or plunder the cargo, and the court will decree them salvage for saving the vessel, because they belong to different owners. The shares of all at the ship St. James at the time she was burned must be forfeited.

The schooner Unexpected went to the wreck after the fire, and saved a large amount of iron which had been burned out, and brought it to this port. A part of it, which the master feared would be identified. he delivered to the master of the ship; the rest he fraudulently sold. This was afterwards discovered, identified, and taken possession of. This being an intentional embezzlement, traced directly to the master of the Unexpected, all salvage to that vessel must be forfeited. This is as far as the court can go in its admiralty jurisdiction, but such forfeitures in no way protect the guilty party from criminal prosecution.

In connection with the several forfeitures declared in this case, the question of to whose benefit shall they accrue, although not regularly raised, has been suggested. In all cases in which I have found this point touched upon at all, the forfeitures have been treated more as a means of punishment to the guilty salvor than an amount given the injured party for damages; and the salvage has been refused, rather than decreed, and then turned from its original contributor through the medium of the salvor. In the case of The Mulhouse [Case No. 9,910], although the misconduct of the salvors related entirely and solely to the specie. yet the forfeited salvage arising from the cotton was decreed to the owners of the cotton. Judge Marvin says in that case: "Forfeited shares are usually made to inure wholly to the benefit of the owners of the property, but not always." What interest shall be benefitted by the forfeiture is a question of sound judicial discretion. I have been able to find no case where salvage has been decreed to be paid by the owners of property then forfeited to another interest. The Rising Sun [Case No. 11,858];

The Boston [supra]; The Blaireau, 2 Cranch [6 U. S.] 240.

In this case it would be very difficult to exactly measure the loss or damage to each separate interest involved, as, by the negligence of the first salvors (although the vessel was lost to the owner), great loss was also caused in the form of salvage and expenses to the cargo. The forfeitures will accrue to the interests which contribute the salvage forfeited, and the decrees follow in accordance herewith.