## THE LAMINGTON.

### DUFF v. MERRITT.

(Circuit Court of Appeals, Second Circuit. April 7, 1898.)

#### Nos. 74–102.

1. SALVAGE—VALUE OF PROPERTY SALVED—COMPENSATION.
   In arriving at the true value of a vessel sold in salvage proceedings, all necessary expenses in repairing and placing her before intending purchasers should be deducted from the amount realized on the sale, and the salvors' compensation based on the remainder.

2. SAME—REDUCTION BELOW QUANTUM MERUIT.
   While the courts are anxious to encourage salvage enterprise by liberality, when possible, yet the business is a speculative one, and their compensation is subject to reduction even below a fair quantum meruit when otherwise nothing would be left for the owner.

3. SAME.
   Where arduous and expensive services to a vessel stranded on the Long Island coast were rendered by a wrecking company, with a cash outlay of $5,000 for outside help employed, and the cargo lightered to New York, but by reason of its perishable nature, and the way in which the vessel stranded, the amount salved was but $17,160.32,—a small part of the property,—the measure of success must be considered, in fixing the award, and 50 per cent. of the value of the property salved is sufficient.[1]  80 Fed. 159, reversed.

These causes come here upon appeals from decrees of the district courts in the Eastern and Southern districts of New York, respectively, upon the following facts:

On February 4, 1896, the British steamer Lamington, 1,224 tons register, inward bound with a full Mediterranean cargo of fruit, stranded on the south shore of Long Island, about a mile east of Blue Point life-saving station. The

---

[1] See note at end of case.

news of her disaster reaching New York, the libelants, who maintain an extensive wrecking plant, were requested to repair to her relief. The service which they thus undertook to render was, as one of libelants testifies, "not done under any formal contract, but on the basis of salvage,—no cure no pay." The following excerpt from the opinion of the court in the Eastern district (in the libel against the vessel) sufficiently sets forth the details of the service rendered: "Merritt proceeded to the Lamington with a tug, and arrived shortly after two o'clock in the afternoon of the 5th, and took charge of the operation. An anchor was got out, and strain put upon it, but it was impossible to move the steamer. The weather during the 6th and 7th was severe, and work was impossible. On the 8th the sea had moderated; the steamer having meanwhile been driven over the outer bar onto the main beach. Then the salvors boarded the ship, and commenced to rig spars and cargo gear for the purpose of lightening the ship. From that time until the 25th, when the weather would permit, the salvors were engaged in lightening the ship, and saving such part of the cargo as was worth saving, which was placed in barges brought from the city of New York, and transported therein to the city of New York, and there sold. [But a small part of the cargo was saved. A large part of it was thrown overboard by the salvors where the steamer lay. A large part of the remainder that was brought to New York in the ship had to be sent out to sea again and dumped.] On the 26th, at high tide, the vessel was pulled off the bar, and taken to New York. The labor involved in this service was hard; the weather being very cold, and much of the time very stormy. After the ship grounded on the shore, the labor was, for the most part, confined to lightening the vessel, and transporting to New York such of the cargo as was undamaged." The property belonging to salvors, or hired by them, employed in the service, amounted to nearly $250,000, but it was not all exposed to risk at the same time. About one-quarter of the salved cargo was lightered to New York, and the rest was brought in the ship itself. The whole of the salved cargo was entered in the New York custom house, and was sold by auctioneers. The ship was first taken to libelant's wharf at Staten Island, and thereafter to Brooklyn, where she was libeled, and subsequently sold for $9,100, and proceeds paid into court. It was because of the circumstance that the ship and its proceeds came into the Eastern district, and the cargo and its proceeds came into the Southern district, that libels were filed in both courts. The proceeding against the vessel was the first to come on for hearing. 80 Fed. 159. The court reached its conclusion by considering the proceeds of ship and cargo together, fixing an award which it thought proper for the whole, and dividing that between ship and cargo proportionately to the respective gross proceeds thereof. The amount thus awarded against the vessel as salvage compensation amounts to $6,550.92. Inasmuch as the total amount to which the court in the Eastern district decided that the salvors were entitled is $19,020.79, it would follow that the amount thereof chargeable to the cargo would be $12,469.87. The amount of salvage thus found by the district court is what it determined to be the "value of the services upon a quantum meruit," and in addition thereto the sum of $1,500 as a "salvage compensation for their risk and their trouble." When the libel against the proceeds of the cargo came on for hearing in the Southern district, that court declined to go into the question of the total amount of salvage award, on the ground that such question had been decided in the Eastern district, and was then on appeal. It found, however, that the gross amount realized from the sale of cargo by the auctioneers was $17,321.81, that the expenses immediately connected with the auction sale itself reduced this amount to $14,147.59, and also that, besides the expenses immediately connected with the auction sale, there were numerous expenses, such as unloading, working over cargo, recoopering, etc., which ought also to be deducted, since without such expenses the cargo either could not be sold at all, or would not have brought the price it did. Deducting these, the court found the total net proceeds available to be $11,405.46, and decreed the entire amount to salvors, but without costs. The claimants have appealed in both cases.

J. Parker Kirlin, for appellants.

Robert D. Benedict, for appellees.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

LACOMBE, Circuit Judge (after stating the facts). It will be most convenient first to ascertain what is the total amount salved as the result of the service rendered. Inasmuch as the libelants have not appealed, it may be assumed that the district judge correctly held as to the expenses which should be deducted in order to determine the amount of cargo actually salved. It will be remembered that the ship sold for $9,100. It was held in the Eastern district (and no one disputes the finding) that the marshal's expenses and commissions should be deducted, leaving the amount $8,962.80. There are other expenses, however, which are equally a charge against the proceeds, superior to the lien of salvors, for the reason that, if they had not been incurred, this sum would not have been realized at the sale. What the vessel would bring as she lay at libelants' wharf, Staten Island, on February 27th, just as she had been torn off the beach, leaking, and with her holds full of débris, and what she subsequently brought in Brooklyn because of these disbursements, are manifestly two widely different sums. These items are as follows: Inward pilotage, $78.34, and $90.54 for dues and fees paid the collector of the port upon entering the vessel at the custom house, do not seem to be disputed; nor does the sum of $1.90 paid to the British consul upon entry of the vessel. There was paid $172 for towing required to get the vessel from Staten Island, where she was first taken, to Brooklyn, and into dry dock. There was paid $12 for running lines from the vessel to the wharf while she was at Brooklyn; $260 for services of a watchman to keep thieves and others from making depredations, and in order to protect her against loss from other causes; and $123 for wharfage. It was necessary for her to be alongside a wharf while discharging, and while not on the dry dock. An item of $1,207.04 paid for the use of dry dock represents the charges for two separate dockings at the Erie Basin. The first docking was necessary in order to stop the leaks which had been caused by her stranding, and to keep the vessel afloat, and to enable temporary repairs to be made. The second docking was necessary in order to place her in a position where her bottom and hull could be examined by intending purchasers after it had been finally determined to sell her; all efforts at an adjustment without suit having failed. An item of $1,089.08 was paid for the making of temporary repairs, which were necessary in order to keep the ship afloat, and for cleaning the holds, which was necessary in order that the engines and bottom of the vessel could be examined by intending purchasers. There was also paid $96 for ballast logs, which were required to keep the vessel from capsizing after her cargo had been removed; her ballast not being such, or in such condition, as to prevent this. These items aggregate $3,129.90, to which the usual commission on disbursements, 2½ per cent. ($78.24), should be added, making $3,208.14. There is no dispute as to the reasonableness of the amount of any of these charges, and it would certainly seem that they would have to be made by some one, in order to secure any substantial price for the property offered for sale. They are represented in the $9,100, and that sum, less these items, was the value of the salved vessel as she was brought to libelants' wharf at Staten Island. Logically, they are disbursements

properly to be made by salvors, and repaid to them independent of salvage, as was done with the towage to place of sale in the case of The William Smith, 59 Fed. 615. That the money to pay these disbursements was in fact advanced by owners' agents is no ground for declining to repay them in their proper order. And see The Waterloo, 1 Blatchf. & H. 114, Fed. Cas. No. 17,257. Deducting from the $9,100 the marshal's charges ($137.20) and these additional disbursements ($3,208.14), there is left $5,754.66 as the true value of the salved property represented by the ship; and, since the district judge in the Southern district has found that $11,405.66 is the true value of the salved property represented by the cargo, it follows that the total amount awarded by the decrees of the two courts ($6,550.92 + $11,405.-66), viz. $17,956.58, actually exceeds the total amount salved ($5,754.66 + $11,405.66), vis. $17,160.32.

In The Bay of Naples, 1 C. C. A. 81, 48 Fed. 737, this court held that the amount of a salvage award might be reviewed and readjusted "if the decree below does not follow in the path of authority, even though no principle has been violated or mistake made," and the award made therein by the district court was materially reduced. In the case at bar the amount awarded seems not only to be excessive, but also to be arrived at by the application of a rule of compensation not warranted by authority. The results of a somewhat comprehensive examination of the salvage cases contained in the reports of the federal courts have been, for convenience of future reference, embodied in a note annexed to this opinion. While it appears most clearly that, since the old hard and fast rule of "50% of a derelict" was abandoned, the award is determined by a consideration of the peculiar facts of each case, it is none the less true that the admiralty courts have always been careful not only to encourage salving enterprise by liberality, when possible, but also to recognize the fact that it is, after all, a speculation, in which desert and reward will not always balance. It is unnecessary to rehearse here the various ingredients of a salvage service which are to be considered in determining award. The service was promptly rendered. It was arduous, long continued, and meritorious. It involved the salvors in considerable expense, not only for the wages and support of their regular crews, but also for the hire of other assistance, to the amount of $5,000. It exposed valuable property to risk. It was skillfully performed, and was rendered by salvors who maintain a most expensive plant, ready at any hour of the day or night to afford aid to vessels in distress. It happened, however, by reason of the perishable nature of the cargo, and of the way in which the vessel stranded, and the condition of wind and tide, that the skill and exertions of salvors were able to salve but a small part of the property at risk. $17,160 must be but a low percentage of the value of a 1,200-ton steamer, carrying a full Mediterranean cargo. To a certain extent, salvors were successful; to a certain extent, they failed; and it would seem that their measure of success should not be overlooked, if their business be indeed a speculative one, which no one disputes. "Regard is always paid to the value of the property saved, and an award will not be made of such an amount as to deprive its owners of the benefit of the service, with

the view of recouping to salvors their losses. It is one of the risks they run, that they may not be indemnified for their sacrifices. It is said that the court of admiralty has hardly ever, and then only in the case of a derelict, awarded as salvage more than half the value of the property saved." Carv. Carr. by Sea, § 345. In the opinion filed by the district judge in the Eastern district against the ship, it is said, "No case has been found where, in awarding compensation for salvage services, the salvors have not been awarded more than the value of the services upon the basis of quantum meruit;" and therefore the conclusion was reached that something more than $17,520, which was found to be the value of the services, should be given. Incidentally it may be noted that we find no sufficient proof in the record that $17,520 was the "value of the services on the basis of quantum meruit." The amount is arrived at by charging for the services of the various steam vessels and other property used by salvors "at their regular schedule rates." But they conduct a wrecking business. They do not expect to be able to employ all their vessels all the time. They often have to tie up for considerable periods, waiting for a job, and the schedule rates are undoubtedly arranged to cover these elements of loss. Moreover, the authorities do not support the conclusion of the district judge, although it is quite true that in most of them sufficient was saved to pay for the services on the basis of a quantum meruit, and leave a reasonable surplus for salvage bonus, and the owner as well. In three reported cases the entire proceeds were given to the salvors. The circumstances, however, were exceptional, and totally different from those in the case at bar. In The Zealand, 1 Lowell, 1, Fed. Cas. No. 18,205, a derelict was picked up at sea, and brought into port. Her proceeds amounted to $206 only, and there was evidence that the owner had been informed of the proceedings, and refused to appear. In Llewellyn v. Two Anchors & Chains, 1 Ben. 80, Fed. Cas. No. 8,428, the value of the property was $107, and notice of the proceedings was brought home to the owner, who failed to appear. In The Burlington (1896) 73 Fed. 258, the proceeds of the sunken barge amounted to about $1,100, not much more than one-fifth of what it had cost the salvors to raise her, and they were given the whole amount. The Burlington, however, had burned and sunk as a result of the fire. The owner abandoned her to insurers, and collected a total loss. After sinking, she shifted position so as to become an obstruction to navigation. She lay in the Detroit river, on the Canadian side; and under a Canadian statute the minister of marine ordered her removal, and made an agreement therefor,—the person removing to accept whatever he might recover from the wreck in full payment for his services. That the compensation of salvors is subject to reduction, even below a fair quantum meruit, when otherwise nothing would be left for the owner, is a proposition approved in the opinions of the courts in the following cases, although in none of them are the facts exactly like those in the case at bar. Except a few found in the note, these are all the cases in the federal reports where the smallness of the property salved is discussed in connection with the amount of the award:

In The Waterloo (1830) Blatchf. & H. 114, Fed. Cas. No. 17,257, the vessel, abandoned at sea, was brought into port by salvors. Betts, J.:

"The tendency of a preponderance of decisions is manifestly to consider 50% the ultimatum of salvage to be allowed in cases of derelict. * * * The claims of libelants in this case, if allowed, would absorb the whole proceeds of ship and cargo. This the courts will not sanction, except in cases where the property saved is so small in value as to be necessarily all required to cover charges, and make any compensation to the salvors. The doctrine of salvage derives its support from the consideration that, however munificent the award may be to the salvor, something—a residuum—is left to the owner. His rights are not to be deemed derelict. One of the most satisfactory reasons for allowing a discretion to the courts in this respect is that they can reward, not only according to the merit of the services, but also in proportion to the amount saved. I have met with no instance in which the whole amount saved, and an amount equal to what was preserved in this case, has been all of it taken from the owner. The ship and cargo sold for $39,000; custom-house duties were $22,000; leaving a balance of $17,000 only. Courts, in so doing, would be instituting the rule of nature, or rather of barbarism, in devoting to the first finder whatever property the exigencies of the owner had wrested from him, or compelled him to desert. * * *. The main effort of libelant's counsel has been to throw the whole of the duties on the owner, and leave the salvors the same degree of compensation that would be allowed if the gross proceeds of the property represented its net avails. * * * Enough to say that nothing more can be considered saved in this case, out of which salvors may be rewarded, than what remains after satisfaction of the duties. Whether that proportion goes to the government, as the price for the enjoyment of the salved property, or perishes at sea, the residue is all that the exertions of the salvors have placed at the disposition of the court."

The award was 45 per cent. of the net proceeds, which, however, was apparently sufficient to pay the quantum meruit, and more.

In The Adolphe (1837) 19 Am. Jur. 219, Fed. Cas. No. 17,712, the property salved was found on a vessel abandoned in a harbor on an uninhabited coast (Patagonia). "The services rendered in this case * * * were laborious, but not particularly perilous, except the dangers which threatened the Triton, which have been stated, but which were guarded against by means of the cables and anchors of both vessels, though with much vigilance and labor." Referring to the "liberal compensation which it is the policy of the admiralty law to allow for salvage," the court says:

"I regret that it is not in my power to give this compensation to the salvors in this case without losing sight of the owners of the property saved. This I have no right to do. The salvors had no right to place the owners of this property in a predicament which would subject them to a loss of all their property, in expenses, costs, and salvage. Something should remain to the owners of the property saved, as well as something given to those who volunteered their services in saving it. [The gross amount of sales was $6,797; customs duties, $737; and marshal's fees and expenses, $586.] Considering the small amount saved, compared with the labor and services rendered, I have felt constrained to exceed the maximum, and give 60%, after deducting duties, leaving costs and expenses on the remainder."

In The Joseph Stewart (1838) Crabbe, 218, Fed. Cas. No. 13,070, there were 13 claimants for salvage, including the owners of the schooner Caspian, which found the schooner Joseph Stewart abandoned by her crew, having nearly two feet of water on deck, partially stripped, and with auger holes in her bottom. The court says:

"The difficulty in this case arises, not in estimating the nature and value of the service, nor in ascertaining * * * a rule of proportion for the reward of such a service. * * * Here the fund is so small that the whole of it, distributed among these 13 salvors, could hardly be considered an extravagant reward for their service. Yet we have no authority to treat this as a derelict. * * * Indeed, the libelants claim as salvors, not as finders of property that has no owner. They ask for salvage,—for a reward out of the property saved, for their services in saving it. The very nature of this claim is a demand on the owner for a reasonable compensation for the service rendered him in rescuing his property from total loss; but, if the salvors are to take all, the loss would be as total to the owner as if his property had been swallowed up by the sea. It would be manifestly absurd to call upon the owner with such a demand,—to restore him no part of the property saved, but to tell him they must have all for saving the rest. He is to pay for saving, when nothing is saved. Every reason and principle applied to a claim for salvage implies that a part of the property saved is to be awarded to the salvors, and the rest restored to the owner. Heretofore, under even the most desperate cases, by far the greater part was restored to the owner. Here is our difficulty in this case. After deducting the expenses of these proceedings, * * * and allowing salvors a very moderate, perhaps an inadequate, compensation, * * * there will be little left."

The total gross proceeds were $926.40, of which the salvors were awarded 50 per cent. (about $460), and the wreck charged with all the costs, which left some $200 for the owner.

In The Amethyst (1840) 2 Ware, 28, Fed. Cas. No. 330, three schooners fell in with a derelict, and undertook to tow her towards a harbor. She broke away in a storm, and was driven on a reef, and wrecked. At risk of life and property, they got something in the way of cargo out of her. The court says:

"The whole mass of property saved is small, * * * $841, the largest part of one moiety of which is exhausted by the necessary expenses of getting the property ashore and securing it after the wreck went on the rocks. So that, leaving but a pittance for the owners, the compensation of the salvors will scarcely amount to a quantum meruit for the laborious and dangerous service of rescuing the property from the waves * * * and the piratical shoresmen."

The award was $400.

In The Carl Schurz (1879) 2 Flip. 330, Fed. Cas. No. 2,414, a sunken vessel was raised at an actual expenditure of $568.65. The court thought the salvor had expended more than was necessary, but that circumstance is not made the ground of decision. The vessel brought only $792, which was the sum in the court to answer costs, and for distribution between the salvor and owners. The sale took place at a most unfavorable time, but that was an error of judgment for which the court held neither party to blame. The libelant claimed that under no circumstances should he be allowed less than his actual expenditures of money; the court, however (Hammond, J.; Brown, J., concurring), overruled this claim, allowing only 50 per cent. of the proceeds left after payment of costs; the court saying:

"The libelant and the owners must mutually bear their respective share of the loss in value by the sale. If the libelant has been unfortunate, and has spent his time and money in saving a property not worth the expenditure he made, or if, having saved enough to compensate him, it is lost by the uncertainties of a judicial sale for partition, so to speak, it is a misfortune not uncommon to all who seek gain by adventurous speculations in values. The libelant says in his testimony that he relied entirely on his rights as a salvor. This being

so, he knew the risk he ran, and it was his own folly to expend more money in the service than his reasonable share would have been worth under all circumstances and contingencies. He can rely neither on the common-law idea of an implied contract to pay for work on and about one's property what the work is reasonably worth, with a lien attached by possession for satisfaction, nor upon any notion of an implied maritime contract for the service, with a maritime lien to secure it, as in the case of repairs, or supplies furnished to a vessel, or the like. In such a case the owner would lose all if the property did not satisfy the debt, when fairly sold. But this doctrine has no place in the maritime law of salvage. It does not proceed upon any theory of an implied obligation, either of the owner of the res, to pay a quantum meruit, nor actual expenses incurred, but rather on that of a reasonable compensation or reward, as the case may be, to one who has reduced the res from danger of total loss. If he gets the whole, the property had as well been lost entirely, so far as the owner is concerned. The Joseph Stewart, Crabbe, 218, Fed. Cas. No. 13,070. I think the public policy of encouragement for such service does not, of itself, furnish sufficient support for a rule which would exclude the owner from all benefit to be derived from the service. The property is saved for him, not the public, and he cannot be said to have impliedly authorized his whole property to be exhausted in saving it, particularly where he has not abandoned it, and it is not derelict."

In Hattrick v. The Spanish Bark (1880) 11 Fed. Cas. 831, the vessel was found dismasted, derelict, and helpless, near the shore of a dangerous coast, at a great distance from port. The court says:

"This is one of those unsatisfactory cases of salvage claim, * * * where, on account of the greatly disproportioned value of labor and services rendered as decided by any other criterion, it is impossible to compensate the salvors with the liberality which should always control such awards, and be an inducement for others to render like services on similar occasions. * * * The salving vessel undoubtedly forfeited her insurance, and increased the risk of her voyage. The actual expense incurred by the detention was very considerable, and sufficient to justify a much more liberal compensation than can be paid for the property saved. It is shown that the propeller, during the services, was broken; thereby entailing an extraordinary expense, which it is claimed should be paid by the salved property. The entire property salved would be insufficient to compensate fully for the loss claimed to have been caused. * * *"

The net proceeds in the registry were $2,000, and the award made was $750; the court saying:

"This is as large a compensation as can, under the circumstances, be reasonably allowed. This will be an unusually large percentage, according to awards for like services, yet necessarily very small, when the actual amount of labor performed and property expended is considered."

In The Edwards (1882) 12 Fed. 508, the property salved was found in the hold of a bark wrecked on Alacran reef, abandoned and gone to pieces. It was saved by diving by naked divers in 2 to 2½ fathoms, was boated 7 miles to the salving vessel, and carried 500 miles to port. Time, one week.

"The value saved, compared with the labor of saving it, is small; being, after payment of expenses and duties, but about $700. * * * It is true that in rendering a salvage service the salvor assumes the risk of failure, and his salvage depends upon his success, and the amount of property saved; yet when there is enough to fully compensate him for time and labor, and leave a reasonable proportion for the owner, he should certainly be awarded that, if the amount will allow no more."

In The Clara E. Bergen (1882) 21 Fed. Cas. 816, it is said:

"It must ever be borne in mind that the salvor depends wholly for any compensation upon success. If he fail,—never mind what his enterprise, labors,

sacrifices, damage to property or injury to person,—he can get nothing. \* \* \* He must save before he can ask to share what is saved. The owner, in fact and in law, can only be called upon to give to the salvor a portion of that very property which the salvor has saved for him; to restore only a portion of that which, but for the salvor, would have been lost to him."

In The Cairnsmore (1884) 20 Fed. 523, Judge Deady says:

"Allowing that libelants were engaged in the work of saving this property 40 days, $5 a day for each of them during the whole period, or $2,400 in all, in addition to the $383.82 in money which they expended for teams on the beach, etc., seems to me a very reasonable compensation for their care and labor. But if the property is only worth $2,500, as alleged by these claimants, there would not be that much left after paying the costs of the proceeding; whereas, if it be worth $8,000, as alleged by libelants, \* \* \* the one-half or one-third of its value might be sufficient. \* \* \* The reward for salvage service is affected, among other things, by the value of the property saved. This is one of the risks which wreckers take."

Award postponed until after sale.

In The L. W. Perry (1896) 71 Fed. 745, a schooner laden with tan bark, water logged and derelict on Lake Michigan, was picked up by a passenger steamer, which departed from her voyage, and was detained one day by the service. One hundred dollars a day would be her actual expense, aside from the value of the service rendered. The total net proceeds were $335. The court says:

"Without regard to the element of reward which is intended by the salvage allowance, it is manifest that remuneration pro opere et labore would be in excess of the fund here, if such basis were allowable. \* \* \* While salvage is of the nature of a reward for meritorious service, and for the determination of its amount the interest of the public, and the encouragement of others to undertake like service, are taken into consideration, as well as the risk incurred and the value of the property saved, and when the proceeds for division are small the proportion of allowance to the salvor may be enlarged to meet these purposes, nevertheless the doctrine of salvage requires, as a prerequisite to any allowance, that the service 'must be of some benefit to the owners of the property salved; for, however meritorious the exertions of alleged salvors may be, if they are not attended with benefit to the owners they cannot be compensated as such.' Abb. Shipp. (London Ed., 1892) 722. The claim of the libelant can only be supported as one for salvage. It does not constitute a personal demand, upon quantum meruit, against owners, but gives an interest in the property saved, which entitles to a liberal share of the proceeds."

After citing The Waterloo, supra, and The Joseph Stewart, supra, the court concludes:

"One of the grounds for liberality in salvage awards is the risk assumed by the salvor,—that he can have no recompense for service or expense unless he is successful in the rescue of property, and that his reward must be within the measure of his success. He obtains an interest in the property, and in its proceeds when sold, but accompanied by the same risk of any misfortune or depreciation which may occur to reduce its value. In other words, he can only have a portion in any event; and the fact that his exertions were meritorious, and that their actual value, or the expense actually incurred, exceeded the amount produced by the service, cannot operate to absorb the entire proceeds, against the established rules of salvage."

The award made was 75 per cent. of the net proceeds.

These authorities lend no support to the proposition that salvors are to be paid full value, pro opere et labore, although by so doing there is practically nothing left for the owner. On the contrary, the salvage award should be fixed upon due consideration of every ele-

ment in the case, and the sum actually expended by salvors is but a single element. The salvor risks every dollar thus laid out upon a chance. In the event of complete nonsuccess, he loses all. There is no reason why, in the event of partial nonsuccess, he should not lose a part. And it would seem that this principle may with peculiar propriety be applied in the case of a permanent wrecking organization. The volunteer, who on some chance occasion lends valuable aid to a vessel in distress, may never have another opportunity to act as salvor. If ill luck or the strict application of well-recognized rules reduces his award for most meritorious services to a wholly insufficient pittance, it would be a rare stroke of luck which would bring him the opportunity a few months later to salve another vessel, whose value would insure him a sum greatly in excess of what it cost to save her. But with a permanent wrecking company there is the constant opportunity for such equalization, especially since the courts have approved the rule that liberal salvage is to be awarded to such organizations, to encourage professional salvors to maintain expensive plants, and keep their vessels manned and equipped for the rescue of distressed vessels. The Albion Lincoln, 1 Lowell, 71, Fed. Cas. No. 144. And see the opinion of this court in The St. Paul (handed down herewith) 86 Fed. 340. The two cases now before this court well illustrate the above suggestion as to equalization. The same salvors lose part of their expenditures on the Lamington, but receive several times their expenditures on the St. Paul. The courts were at first inclined to look with disfavor upon the claims of wrecking companies to salvage reward, but since the decision in The Camanche, 8 Wall. 448, the contrary rule has prevailed. The skill that comes from long experience, joined with more powerful machinery, and devices specially adapted to the purpose in hand, are of more service to an imperiled vessel than is the aid which may be expected from a chance rescuer. To provide such skill, machinery, and appliances, and to keep them always ready for instant service, though they may be called for but occasionally, is now regarded as a meritorious act, calling for a liberal award. The Caroline (1857) 6 Am. Law Reg. 222, Fed. Cas. No. 16,956; The Vickery (1858) 23 Fed. Cas. 330; The Vindicator (1881) 7 Fed. 236; Id. (1882) 13 Fed. 127; The Egypt (1883) 17 Fed. 369; The R. D. Bibber (1887) 33 Fed. 55; The Andrew Adams (1888) 36 Fed. 205; The City of Worcester (1890) 42 Fed. 916.

It remains only to determine what amount should be awarded in this case. Leaving out of view for the moment the amount expended by salvors, the services would seem to rank with those rendered in reported cases where 15 to 20 per cent. was paid. But we may not overlook either the amount expended or the amount salved. Both are elements of importance. And the most cursory examination of the authorities shows that the percentage of award moves up or down as these increase or diminish. There was a cash outlay by libelants of over $5,000, made expressly for the prosecution of this particular adventure, and which thus stands on a different footing from the expenditure for wages and maintenance of officers and crews, which would have to go on whether there was

a salvage expedition on foot or not. This special expenditure may properly be considered in estimating the amount of award, and, as is stated in the cases cited supra, the salvors should be made whole for what their service cost them, provided that can be done, and a reasonable amount preserved for owners. Taking all these elements into consideration, and in view of the suggestion in appellant's brief that salvors should receive their cash outlay, and something reasonable in addition, not exceeding $3,000, we have reached the conclusion that 50 per cent. of the net proceeds ($17,160.32) would be a proper award in this case. Inasmuch as libelants would be entitled to costs in the district court, and the claimants to costs of these appeals, such costs may be held to balance each other. The decrees of the district court are reversed, and causes remitted, with instructions to decree in accordance with this opinion, but without costs.

## NOTE.

### Salvage Awards in the Federal Courts.

(A note by the court, filed with the opinion in Merritt v. The Lamington, decided in court of appeals, Second circuit, April, 1898.)

Although most of the reported cases bearing on the questions presented in Merritt v. The Lamington will be found in this list, it is by no means a complete summary of all salvage causes. The omissions include all cases of rescue or recapture from pirates or alien enemies; some cases where the award has been small, the service being considered as little better than a mere towage or pilotage service; some of the very numerous Florida Reef cases, enough being cited to show the prevailing rates; some cases of salving from fire; some cases where there have been reductions for some special impropriety or carelessness by salvors; some where the report gives no details of the service rendered, or the peril; and some, such as The Helder Borden, 1 Spr. 144, Fed. Cas. No. 6,600, which are unusually peculiar in their circumstances. With these exceptions, it is thought that the list is reasonably exhaustive.

#### 1. FIFTY PER CENT. AND OVER.

1797. The Harmony, 1 Pet. Adm. 34, note, Fed. Cas. No. 3,089. Ashore on Bahama bank, abandoned. "With very great labor, difficulty, and danger, brought to New York." Amount salved does not appear. Award, 50 per cent.

1803. The Jefferson, 1 Pet. Adm. 46, Fed. Cas. No. 9,793. In distress at sea. Abandoned, but not derelict. Salvors, after great peril and exertion, brought her into New York. Time, 2 weeks. Amount salved does not appear. Award, 50 per cent.

1803. The Blaireau, 2 Cranch. 240. A ship and cargo abandoned at sea in a sinking condition by its crew, and brought 3,000 miles into port, without boats or anchors, at great risk. Amount salved, $60,274. Award, 60 per cent.

1803. The Bellona, Bee, 193, Fed. Cas. No. 3,428. Derelict and disabled 600 miles from land, in a tempestuous time of the year. Value salved, "considerable." Award, 50 per cent.

1831. The Galaxy, Blatchf. & H. 270, Fed. Cas. No. 5,186. Derelict schooner. No peculiar circumstances. Amount salved, $4,000. Award, 50 per cent.

1833. The Henry Ewbank, 1 Sumn. 400, Fed. Cas. No. 6,376. Ship derelict on the high seas. "No uncommon perils or difficulties, or any distinguished gallantry." Amount salved, $31,488. Award, 50 per cent.

1833. The Boston, 1 Sumn. 328, Fed. Cas. No. 1,673. Schooner derelict, or quasi derelict. "Hazards encountered by salvors not very great." Time, "short." Amount salved, $9,400. Award, 50 per cent.

1836.  The America, 1 Fed. Cas. 596.  Vessel ashore and broken up.  Facts not given.  Award, 25 per cent. on cargo salved dry, 50 per cent. on cargo salved damaged, 60 per cent. on cargo salved by diving.

1836.  The Ajax, 1 Fed. Cas. 252.  Ship lost on Florida reef.  Part of the cargo salved dry and uninjured, part wet and damaged.  Awards, 35 per cent. on the dry, 50 per cent. on the wet, and 50 per cent. on ship's materials.

1836.  The Dorothea Foster, 1 Adm. Rec. 368, Fed. Cas. No. 429.  Salving portion of cargo and materials from a wreck.  "Much difficulty and some danger"; "a case of much merit."  Amount salved, $9,208.  Award, 50 per cent.

1834.  The Sea Flower, 1 Adm. Rec. 149, Fed. Cas. No. 430.  Brig aground on a reef, badly broken up.  Supposed likely to go to pieces in six hours.  Cargo, quicklime, which would all be lost as soon as she bilged.  "The cargo salved * * * of little value. * * * Ship not worth much. * * * Compensation must necessarily be small when divided between 2 vessels and 20 men, but there are no peculiar circumstances attached to this case which would seem to require that it should be taken out of the ordinary rule. * * * Moiety is usual allowance under such circumstances."  Award, 50 per cent.

1835.  The Lexington, 1 Adm. Rec. 167, Fed. Cas. No. 8,336.  Brig aground on Florida reef, where vessel and cargo would have been a total loss but for the timely assistance of the salvors, rendered at great hazard.  Amount salved, $6,875.  Award, 50 per cent.

1837.  The Adolphe, 19 Am. Jur. 219, Fed. Cas. No. 17,712, cited in opinion supra.

1838.  The Joseph Stewart, Crabbe, 218, Fed. Cas. No. 13,070, cited in opinion supra.

1839.  The Alabamian, 2 Adm. Rec. 254, Fed. Cas. No. 128.  Ship aground on a Florida reef.  Master jettisoned part of his cargo.  On arrival of wreckers, a part of the cargo transferred to them.  They tried to pull ship off, but unsuccessfully.  After they left, she got off.  Compensation confined to cargo transferred.  "Treated generously because they helped the master unsuccessfully."  Amount salved, $30,000.  Award, 78 per cent. ($23,500).  "This is a large salvage, but, as in governments and in morals, so also in the decisions of this court, particular interests had better be made, sometimes, to yield, to a certain extent, to the greater interests of the general whole; and a general policy which has for its object the safety of commerce through the dangerous Florida Gulf had better be vindicated and sustained."

1840.  The Amethyst, 2 Ware, 28, Fed. Cas. No. 330, cited in opinion supra.

1840.  Bearse v. Three Hundred and Forty Pigs of Copper, 1 Story, 314, Fed. Cas. No. 1,193.  Ship wrecked and went to pieces on Monomoy Point.  Pigs of copper became imbedded in sand, and so remained.  Award, 40 per cent.

1842.  Sprague v. One Hundred and Forty Barrels of Flour, 2 Story, 195, Fed. Cas. No. 13,253.  A clear case of derelict.  Service meritorious.  Amount small ($696).  "Moiety is the general, though not inflexible, rule.  It yields to circumstances, but with great reluctance will it be increased."  Award, 50 per cent. of the gross, which is about 60 per cent. of net proceeds.

1842.  The John Taylor, Newb. 341, Fed. Cas. No. 2,482.  Ship wrecked on south coast of Cuba.  Over a month spent in efforts to get her off, in salving cargo, and in stripping ship.  "The Warrior and her crew did all that human agency could accomplish in effecting the object."  Amount salved, $4,800.  Award, 50 per cent. (approving an agreement for that sum).

1844.  Two Hundred and Ten Barrels of Oil, 1 Spr. 91, Fed. Cas. No. 14,297.  A whaling ship finds wreck of another whaler on a reef 40 miles from Feejee Islands,—a place dangerous to navigation, from sands, calms, and currents.  Efforts made for three days to save something, with but slight success.  Wreck then went to pieces, and 224 barrels of oil picked up.  Court refers to "the desperate situation of the property, the distance of the wreck from any country where assistance could be pro-

cured being about 1,000 miles; * * * the great risk incurred. * * * "Salving vessel was carried by swell within 20 or 30 rods of the reef, and only saved by springing up of a breeze." Insurance was forfeited (about $2,000). Amount salved, $6,740. Award, $5,740 (about 85 per cent).

1853. The Cimbus, 5 Adm. Rec. 30, Fed. Cas. No. 2,718. Ashore on Florida coast. Broke up in two fathoms. Portion of cargo, including locomotive and railroad iron, salved by diving. Amount salved, $18,000. Award, 50 per cent.

1853. The Nathaniel Kimball, 4 Adm. Rec. 679, Fed. Cas. No. 10,033. Ship ashore nine miles out from Key West. Seven vessels and 99 men employed one month. Weather more than commonly boisterous and windy. Sea high. Amount salved, $56,600. Award, 30 per cent. on dry cargo, 50 per cent. on wet, salved by diving and working under water.

1853. The Pandora, Newb. 438, Fed. Cas. No. 4,442. Bark on fire in port, abandoned by captain. "The value of the property salved is small, and it is certain that it was entirely through libelant's persevering efforts that it was finally rescued." Amount salved, $1,525. Award, 50 per cent., after deducting court costs and expenses.

1854. The Elizabeth Bruce, 5 Adm. Rec. 162, Fed. Cas. No. 4,358. Ship aground on Carysfort reef. Three vessels worked five days in boisterous weather. Amount salved, $8,276. Award, 50 per cent.

1856. The Isaac Allerton, 5 Adm. Rec. 612, Fed. Cas. No. 7,088. Ship went to pieces on a Florida reef. A large number of vessels and 434 persons were engaged, off and on, for two months, saving cargo sunk in five fathoms. Cargo was reached by tearing off deck planks by explosives, by contrivances for fishing up the packages, and by diving; services generally attended with considerable danger to life and health. "No case," says the court, "has ever occurred before, upon this coast, of saving so large an amount of property by diving, or of saving any amount by diving in such deep water"; and cites The Thetis, 3 Hagg. Adm. 14 (on appeal, 2 Knapp, 390) where a British frigate, with $810,000 in bullion, sank in a cove on the Brazil coast, where the tides made a whirlpool, and the crews of three sloops of war and a tender were engaged continuously for 18 months in salving $750,000, 'of which they received about $250,000,—the largest award in the books. In The Isaac Allerton, the amount salved was $96,309. Award, 50 per cent.

1857. The Helen E. Booker, 5 Adm. Rec. 714, Fed. Cas. No. 6,330. Ship wrecked on Carysfort reef, where it was difficult and dangerous to lay alongside. Two-thirds of the cargo (railroad iron under water) had to be dived for, piece by piece. "The salvage the court is obliged to give in order to compensate the salvors for their work and labor, simply, will leave but a small proportion of the savings to the owners." Amount salved, $40,415. Award, $22,754.73 (about 55 per cent.).

1857. The Trusty, 2 Fed. Cas. 9. A derelict. No special merit. Net proceeds, $1,468. Award, 50 per cent.

1857. The Caroline, 6 Am. Law Reg. 222, Fed. Cas. No. 16,956 (Taney, C. J.). Brig caught and damaged in ice in Delaware Bay. From the nature of her injuries, could be rescued only by the removal of cargo. This was done (and it was not otherwise possible) with the assistance of a steam tug stationed at the breakwater. Part of the cargo was transshipped, and the brig towed to port. From syllabus: "Where a steam tug is kept constantly employed during the winter, on a dangerous station and at a heavy expense, for the express purpose of rendering salvage and towage service to vessels in distress, her owners are entitled to the full remuneration usually awarded to salvors who peril life and property." Award, 50 per cent. on cargo transshipped; 4 per cent. on vessel and cargo.

1861. The Ft. Wayne, 1 Bond, 476, Fed. Cas. No. 3,012. Steamboat sunk in Mississippi river raised and preserved by wrecking company. Boat sold for $3,650. Cargo salved for $6,761. There was a contract by which company was to receive 30 per cent. on cargo salved, and 25 per cent.

on boat, at an estimated value of $18,000. This would give a total to the company of $6,528. The allowance for cargo ($2,028) was approved. After paying claims for wages accruing after raising, and before libel, there was in registry of court $2,500, of which it awarded $500 to company, which had already received $3,000 (from underwriters). So that they received, in reality, for saving the boat, $3,500, which is within $150 of what it sold for; but nevertheless there was left $2,000 in the registry, available for the owner, with which to pay other claims, such as wages prior to accident. "The object of the company is to save boats and other property in peril on Ohio and Mississippi rivers. * * * They have provided, at a heavy expenditure of money, the necessary boats and machinery for the prompt and efficient prosecution of their business. * * * Though their main object is their pecuniary profit, their operations have been greatly beneficial to the commerce of the West. Their expensive boats and machinery are admirably adapted to rescue property from loss and destruction, and in many cases they have been successful where all other agencies would fail. In this case, boat and cargo would have been a total loss but for the means used for their rescue."

1865. The Charles Henry, 1 Ben. 8, Fed. Cas. No. 2,617. Derelict wreck off Cape Henlopen. Amount salved (vessel and cargo), $3,700. Award, 50 cent., after paying clerk's and proctor's fees.

1870. The Cayenne, 2 Abb. U. S. 42, Fed. Cas. No. 2,532. A bark derelict near the Capes of Delaware. Amount salved, $9,570. Award, 50 per cent., which was reduced on appeal (Hall v. The Cayenne, 27 Leg. Int. 364. Fed. Cas. No. 5,941) to $2,000.

1872. The Clotilda, 1 Hask. 412, Fed. Cas. No. 2,903. Ship stranded on coast of Maine. Part of the cargo removed, and, on the amount thus salved ($20,000) an award of $6,000 (30 per cent.) was allowed. The ship was subsequently got off, after four months' work, by Coast Wrecking Company. Her value was about $25,000, and an agreement for 60 per cent. was approved. "Compensation for salvage services is allowed by reason of the benefit conferred, and ought to bear some proportion to such benefit. This can only be ascertained by an examination of the cargo, and, if found damaged, the benefit being so much the less, the award for salvage should be affected thereby."

1872. The St. James, 20 Fed. Cas. 921. Cargo saved in midwinter by diving in the hold of a wreck on an exposed reef, far from land. Awards, 40 to 50 per cent., and 62 per cent. on cargo from the lower hold, below beams.

1879. The Carl Schurz, 2 Flip. 330, Fed. Cas. No. 2,414, cited in opinion supra.

1881. The Vindicator, 7 Fed. 236. A steamer stranded on the Long Island shore in a position of such danger as to give rise to apprehension that both vessel and cargo would prove a total loss. Vessel broke up 37 days after arrival of Coast Wrecking Company's outfit. Most of the cargo salved in a damaged condition. "The compensation is to be looked at, as it may induce aid by competent salvors to other property in distress; and the equipment of the Coast Wrecking Company, with steamers and pumps and wrecking material and skilled men, and its readiness to act at a moment's notice, must be considered; involving, as that does, large investments and expenses, which go on as well while there is no employment." Amount salved, about $20,000. Award, 50 per cent.

1882. The Edwards, 12 Fed. 508, cited in opinion supra.

1884. The Lahaina, 19 Fed. 923. A steamer valued at $180,000 picked up a schooner the day after leaving New York, in trough of the sea, with no steering apparatus, and a hole in her side. The captain and crew were ready to abandon. Towed her back to New York, losing three days' time, breaking steel hawser, and paying pilotage and towage of $279. The cargo, from its nature, would have been wholly lost if wreck had not been taken in tow. Cargo proceeds barely amounted to the duties and expenses of sale, and no claimant of the cargo appeared. The whole net proceeds of cargo (a small sum) were allowed.

**As to the schooner**, the court says: "Considering \* \* \* the small value of the property saved, the value of the salving ship, and the fact that, had not the schooner been taken in tow, she would have been abandoned, a water-logged wreck, in the track of vessels bound to New York," there will be allowed 50 per cent. of net proceeds, in addition to expenses of steamer, $279, and $200 damage to hawser. The value salved was $3,515.

**1887.** The R. D. Bibber, 33 Fed. 55. A schooner loaded with railroad iron ashore in Galveston Bay. Vessel and cargo salved by libelants under a contract with master for 50 per cent. Wrecking crews had extra pay. Pumps of large cost were used. There was risk of serious damage to property of salvors, and much hardship. Amount salved, $25,000. The 50 per cent. was held a reasonable charge.

**1893.** The William Smith, 59 Fed. 615. A derelict schooner was picked up, and brought into Southport, N. C., by libelant's large and valuable steamship. During salvage, a stranding occurred, which cost the steamer $1,000. The schooner was afterwards towed by salving vessel to New York for sale. After deducting necessary expenses of this last towage, there was left $5,450, net proceeds. Award, **70 per cent.**

**1896.** The L. W. Perry, 71 Fed. 745, cited in opinion supra.

**1896.** The Burlington, 73 Fed. 258, cited in opinion supra.

## II. UNDER FIFTY PER CENT., BUT IN EXCESS OF TWENTY-FIVE PER CENT.

**1792.** La Belle Creole, 1 Pet. Adm. 31, Fed. Cas. No. 17,165. Ship at sea in perishing and hopeless condition. Salvor ship remained by her some time, and with considerable delay and risk; taking out officers and crew, and part of the cargo. Amount salved does not appear. Award, 33⅓ per cent.

**1796.** The Mary Ford, 3 Dall. 190. Ship derelict on high seas, her rigging partly gone. The salving vessel bound on a foreign voyage, without supernumerary hands. Salvage crew found vessel difficult to manage, and brought her in with great exertion, and at considerable risk. Amount salved, $43,110. Award, 33⅓ per cent.

**1800.** Stephens v. Bales of Cotton, Bee, 170, Fed. Cas. No. 13,366. Vessel wrecked on Charleston bar. Her cargo of cotton cast ashore on the adjoining islands, and then secured by great labor, much risk of health, and some of life. Amount salved, about $13,000. Award, 33⅓ per cent. on the cotton, and 50 per cent. on materials.

**1807.** The Cora, 2 Wash. C. C. 80, Fed. Cas. No. 1,621, affirming s. c. (1806) 2 Pet. Adm. 361, Fed. Cas. No 1,620. Crew put on board a derelict vessel, two weeks at sea. Much risk to depleted vessel. A "highly meritorious service." Amount salved, $47,000. Award, 33⅓ per cent.

**1827.** The Hercules, Blatchf. & H. 9, Fed. Cas. No. 303. Brig grounded on a Florida reef. Master and crew remained aboard. Wrecking vessels took in much of her cargo. Got her off the reef, and into Key West. Amount salved, $79,000. Award, $25,000 (about 31 per cent).

**1830.** The Waterloo, Blatchf. & H. 114, Fed. Cas. No. 17,257, cited in opinion supra.

**1842.** The Charles, 1 Newb. 329, Fed. Cas. No. 4,556. Derelict at sea. Amount salved, $9,300. Award, 33⅓ per cent.

**1848.** The Brewster, 4 Adm. Rec. 116, Fed. Cas. No. 1,852. A ship went ashore on Carysfort reef, and broke up. Salvors (150), with 15 to 20 vessels, worked 10 days salving cargo and materials. Amount salved, $58,000. Award, 33⅓ per cent.; and as to some cargo, where diving was necessary, 60 per cent.

**1848.** The Euphrasia, 4 Adm. Rec. 136, Fed. Cas. No. 4,545. Bark ashore on Carysfort reef, in no great peril if weather kept good. Salvors lightened and helped her off. Time short, and no special merit. Amount salved, $46,470. Award, $15,000 (about 31 per cent.).

**1849.** The Delphos, Newb. 412, Fed. Cas. No. 14,400. On fire in Southwest pass. Towed to a convenient place, scuttled, and afterwards raised by salvors. "A liberal compensation should be awarded. Property \* \* \* saved from inevitable destruction by the timely assistance

of the towboats. * * * The claimants, however, have rights which must be protected. They have been unfortunate, and the court will not subject them to any further loss, which may be inconsistent with a fair and equitable compensation to those through whose means they were saved from a greater calamity." Amount salved, $50,000. Award, 45 per cent. ($22,500).

1849. The Maryland, 4 Adm. Rec. 358, Fed. Cas. No. 9,218. Ship ashore. Eight vessels, with 120 men, were occupied in salving the property,—how long, does not appear. Service rendered in very bad and boisterous weather, and under circumstances of some peril to lives and property of salvors. Amount salved, $50,227. Award, 30 per cent.

1851. The John and Albert, 4 Adm. Rec. 534, Fed. Cas. No. 7,333. A ship in ballast ashore on reef near Key West. Salvors floated and got her into port in a few days. "She would have been totally lost but for efforts and labors of libelants, 34 in all, with 4 wrecking vessels. * * * Service was performed with energy and skill, and involved considerable labor and some peril and exposure on the part of salvors and their vessels." Amount salved, $20,000. Award, 30 per cent.

1852. The T. P. Leathers, Newb. 421, Fed. Cas. No. 9,736. Steamer temporarily abandoned, not derelict, on fire, and in imminent peril of total loss. Services highly meritorious, and rendered at risk of life. Amount salved, $45,000. Award, 33⅓ per cent.

1853. The F. A. Everett, 4 Adm. Rec. 621, Fed. Cas. No. 4,603. Bark ashore on a Florida reef. Four large wrecking vessels and others with much difficulty and personal danger salved $31,220. Award, 33⅓ per cent.

1854. The Iconium, 5 Adm. Rec. 287, Fed. Cas. No. 6,995. Ship in ballast aground on Loo-Key shoals. Five wrecking vessels (54 men), in nearly two days of almost incessant labor, succeeded in floating her, by discharging ballast, carrying out anchors, straining on cables, etc. Amount salved, $14,500. Award, 33⅓ per cent.

1854. The Athalia, 5 Adm. Rec. 295, Fed. Cas. No. 598. Schooner ashore on a Florida reef. Vessel a total loss. Seven large wrecking vessels busy four days. Part salved by diving. Amount salved, $41,000. Award, 30 per cent.

1855. The Tevere, 5 Adm. Rec. 364. Brig ashore on a Florida reef in peril of total loss. Three sloops lightened and helped her off in bad weather, with considerable risk. Amount salved, $17,000. Award, 42 per cent.

1856. The Attacapas, 3 Ware, 65, Fed. Cas. No. 637. Brig temporarily abandoned, but not derelict. "Meritorious service." Amount salved, $3,500. Award, $1,200 (34 per cent.).

1856. The Mary Hale, 5 Adm. Rec. 471, Fed. Cas. No. 9,213. Ship cast away upon Keysal bank. Eight vessels salved materials and cargo in bad weather, and under circumstances of some exposure and risk to the salving vessels. Amount salved, $35,000. Awards, 36 per cent. to 45 per cent.

1858. The Osteonthe, 6 Adm. Rec. 166, Fed. Cas. No. 10,608a. For getting out cargo and raising hull of a vessel scuttled in the harbor of Key West to extinguish fire, when total proceeds amounted to $28,000, a contract for $10,000 was approved (being about 35 per cent.).

1859. The Mulhouse, 22 Law Rep. 276, Fed. Cas. No. 9,910. Ship ashore, and total loss, on a Florida reef. Awards, 25 per cent. salving dry deck cotton, 45 per cent. salving cotton submerged between-decks, and 55 per cent. salving cotton by diving.

1859. The Indian Hunter, 6 Adm. Rec. 343, Fed. Cas. No. 7,024. Ship stranded on a Florida reef, a total loss. A large number of wrecking vessels and men were employed, weather permitting, for one month. Amount salved, $91,076. Award, $33,852 (about 37 per cent.).

1860. The Ferris, 17 Leg. Int. 116, Fed. Cas. No. 12,178. A leaking derelict on high seas. Reached port in a week. Amount salved, $18,000. Award, $5,000 (28 per cent.).

1866. The Georgiana, 1 Lowell, 91, Fed. Cas. No. 5,355. A schooner of small value, derelict on high seas, towed into port by vessel of much larger

value, without great personal risk or labor. Amount salved, $1,950. Award, 40 per cent.

1866. The Albion Lincoln, 1 Lowell, 71, Fed. Cas. No. 144. Bark aground near Vineyard Sound, with her rudder broken off. Was gotten off, but could not navigate, and eventually went ashore, becoming a total loss. Some of the cargo (molasses) was salved. "The services were meritorious, and at great expense of time (about one week). The cargo was under water a great part of each tide, and weather extremely cold (about zero, Fahr.)." "The fund is small,—not sufficient to allow a large salvage reward to any one. This is one of the risks which wreckers take, however; and in the case of most of the libelants, who are often employed in the business, it may be supposed to be made up by the larger reward earned when the property is large." Amount salved, $5,200. Award, $2,450 (about 47 per cent.).

1866. The John Wesley, 9 Adm. Rec. 160, Fed. Cas. No. 7,433. Bark ashore on Florida coast, cargo (cotton) and materials salved. Awards: On $121,-826 dry cotton, 15 per cent.; on $39,967 damaged cotton, a slightly higher per cent.; on $2,774 materials, 33⅓ per cent.

1869. The L. T. Knights, 1 Lowell, 396, Fed. Cas. No. 8,585. A coal-laden schooner found derelict at sea, 50 miles from Long Island. Brought into Newport, after 30 hours, with a good deal of labor. There was some risk, also, as the derelict had holes bored in her hull, which were not discovered for many hours. Amount salved, $6,400. Award, $2,500 (about 40 per cent.).

1869. The Comanche, 8 Wall. 448. Wrecking company sent equipment from New York to San Francisco. Work most arduous. Most of it had to be done by divers in the hold of a sunken ship, and was very dangerous. Time, five months. Actual expenditures of salvors, $70,000. Amount salved, $400,000. An agreement for $110,000 was held reasonable (about 27 per cent.).

1873. The Northwester, 10 Adm. Rec. 415, Fed. Cas. No. 10,333. Twenty-five vessels and 229 men were engaged 15 days in extinguishing fire and saving cotton from a burnt and stranded hulk near Key West,—most of it by diving, and under conditions rendered peculiarly disagreeable and injurious, both above and below water, by reason of burnt bales of tobacco in the wreck. Weather, part of the time, cold and boisterous. Amount salved, $85,000. Awards: 20 per cent on cotton dry; 33⅓ per cent. on cotton wet and burnt; 40 per cent on materials; 50 per cent. on property salved by diving.

1875. The Aroma Mills, 2 Hughes, 30, Fed. Cas. No. 2,041. Steamer abandoned and stranded, in imminent peril of hopeless loss. Amount salved, $9,000. Award, 40 per cent.

1875. The Ellen Holgate, 8 Leg. Gaz. 44, Fed. Cas. No. 4,375a. Schooner sunk in a collision. Service lasted some 11 days, the first few in tempestuous weather, with heavy sea running, ice, hail, and sleet, in a dangerous part of Delaware Bay. "The two tugs rendered meritorious service." Amount salved, $7,000. Award. 33⅓ per cent.

1880. The Loveland, 5 Fed. 105. Bark derelict after collision, having lost everything above deck. Service rendered which was attended with difficulty and danger; lasted 51 hours. Amount salved, $25,000. Award, $7,000 (about 26 per cent.).

1880. Hattrick v. The Spanish Bark, 11 Fed. Cas. 831, cited in opinion supra.

1886. The Maggie Willett, 27 Fed. 519. Schooner rescued at sea in a desperate condition. Brought into port. Three days' service. Amount salved, $11,000. Award, 33⅓ per cent.

1887. The Slobodna, 35 Fed. 537. Ship loaded with cotton ashore on Florida coast, a total loss. Forty-one vessels, with 335 men, were engaged 28 days. Awards: 25 per cent. on dry cotton, 33⅓ per cent. on wet cotton; 45 per cent. on materials.

1888. The Lone Star, 35 Fed. 793. Steamship on fire at wharf, towed out, sunk, and subsequently raised by salvors. "Meritorious service." Amount salved, about $25,000. Award, 33⅓ per cent.

**1888.** The Andrew Adams, 36 Fed. 205. A schooner stranded on south coast of No Man's Land, district of Massachusetts, in a place where she was certain to go to pieces in case a storm occurred before she was got off, and where no vessel had ever been got off before. Quicksand beach. A wrecking company, by request, undertook to get her off. Services, with no great danger, but with all possible skill, lasted 20 days, and were successful. The salvors made repairs to the amount of $2,500. "The court should especially take into consideration the business which is carried on by this company. It has procured apparatus of the most expensive character, which is used almost entirely for the purpose of salving vessels wrecked on this coast. It is of the utmost importance to commerce on our coast that such a business should be undertaken and carried on by somebody with sufficient capital and sufficient enterprise to assist wrecked vessels. * * * I think the court should bear that in mind, and see that a liberal measure of salvage is awarded to a company undertaking and performing successfully a service of this kind." Amount salved, about $20,000. Award, 50 per cent., with no addition for the repairs. This leaves the amount of salvage award $7,500 (about 37 per cent.).

**1892.** The Thos. W. Haven, 48 Fed. 842. Schooner abandoned, water logged, with cargo of lumber washing about her deck. Picked up off Frying Pan shoals. Salving vessel worth $20,000. Neither life nor property of salvors in any danger. Vessel and cargo sold for $3,450. Salvage award, $950 of the gross proceeds (i. e. before deducting harbor expenses, towing, wharfage, layage, and expenses of discharge). What these expenses were does not appear. The award is 28 per cent. of the gross proceeds.

**1892.** The Agnes I. Grace, 49 Fed. 663, affirmed in circuit court of appeals, 2 C. C. A. 581, 51 Fed. 958. Schooner with hole in her bottom astrand on a quicksand shoal, into which she sank three feet. Water was pumped out and vessel pulled off by libelant's steam tugs at great risk to the tugs. The schooner's peril was extreme, and chances of success exceedingly slight. Service lasted "several days," and value of property employed over $70,000. Amount salved, $12,030. Award (an agreed sum held reasonable) $5,000 (about 42 per cent.).

### III. TWENTY-FIVE PER CENT. AND UNDER.

**1816** The Sybil, 5 Hughes, 61, Fed. Cas. No. 4,824; Id. (1819) 4 Wheat. 98. In distress and abandoned by crew to salvors 600 miles from land. Amount salved does not appear. Award, 25 per cent.

**1832.** The Emulous, 1 Sumn. 207, Fed. Cas. No. 4,480. Schooner ashore on a reef in Vineyard Sound. Abandoned temporarily, but not derelict. Less than two days' service, and weather not boisterous. Amount salved, $5,722. Award, $850 (about 15 per cent.).

**1836.** The Bee, 1 Ware, 336, Fed. Cas. No. 1,219. Vessel ashore on Grand Manan, abandoned by master and crew. Salvors got her off, and to port. "It is not a case which demands a high rate of salvage." Amount salved, $2,000. Award, $350 (about 17 per cent.).

**1837.** The Ella Hand, 2 Adm. Rec. 24, Fed. Cas. No. 4,369. Bark aground. Salvors lightened, got her off, and took into port. She was not in a position of peril to herself, as the master could have got her off by jettison. Amount salved, $33,200. Award, $7,500 (about 23 per cent.).

**1838.** The Howard, 2 Adm. Rec. 148, Fed. Cas. No. 6,752a. Bark ashore on Florida reef. Rescued in a partially damaged condition. Nothing specially meritorious about the service. Amount salved, $35,391. Award, 25 per cent.

**1841.** The Grace Brown, 2 Hughes, 112, Fed. Cas. No. 1,171. Ship ashore, deserted, but with intention to return; not derelict. Nothing unusual in service. Amount salved, $38,000. Award, $2,400 (about 6 per cent.).

**1843.** The Ann Johnson, 4 Adm. Rec. 527. Vessel hauled off a shoal without much trouble. Situation not perilous, except in the event of a storm. Amount salved, $14,000. Award, $2,000 (about 14 per cent.).

1845. The John Gilpin, Olcott, 77, Fed. Cas. No. 7,345. Brig ashore in lower bay of New York, abandoned, in peril of instant destruction,—ultimately went to pieces. Services well-timed, faithful, and beneficial, but nothing extraordinary. Amount salved, $11,294. Award, 20 per cent.

1853. The William Penn, 2 Hughes, 144, Fed. Cas. No. 1,965. Ship ashore off Charleston harbor. Salving steamer, after a night of considerable peril, succeeded in getting her off. Amount salved, $23,000. Award, 15 per cent.

1853. The H. D. Bacon, 1 Newb. 274, Fed. Cas. No. 4,232. Salvors, by the use of their machinery and a diving bell, worth $20,000, raised a badly-sunken steamboat in the Mississippi river in 12 hours. Amount salved, $20,000. Award, approving a contract for that amount, $4,000 (or 20 per cent.).

1854. The Angeline, 5 Adm. Rec. 202, Fed. Cas. No. 385. Schooner ashore on Carysfort reef. Wreckers got her off. No very highly meritorious service. Amount salved, $2,100. Award of 20 per cent. held reasonable, but reduced for specific misconduct.

1855. The John Land, Hoff. Op. 96, Fed. Cas. No. 3,939. Salving vessel abandoned a whaling cruise, and spent nine months in bringing the salved ship to port. Amount salved, $260,000. Award, $60,000 (about 23 per cent.).

1855. The Ellen Hood, 5 Adm. Rec. 347, Fed. Cas. No. 4,377. Ship grounded on coast of Florida, but in no great peril. Could have got off without assistance, by jettison. Amount salved, $192,391. Award, 11 per cent.

1856. The Ashburton, 5 Adm. Rec. 432, Fed. Cas. No. 575. Ship stranded. Six large wrecking vessels, besides small boats, engaged in the service. An unnecessary number. "There is to be no increase of compensation for the use of supernumeraries." Amount salved, $73,000. Award, 15 per cent., but reduced for neglect to sound, thus putting ship aground again.

1856. The Diadem, 5 Adm. Rec. 561, Fed. Cas. No. 3,874. Ship stranded on reef near Key West, in imminent peril. Time of service does not appear. Amount salved, $125,000. Award, $12,000 (about 10 per cent.), but reduced for misconduct.

1856. The Albus, 1 Fed. Cas. 323. Ship, aground in a perilous position, employed a schooner to carry her anchors, and by that means got off. Amount salved, $20,000. Award, $2,500 (about 12 per cent.).

1857. The Crown, 5 Adm. Rec. 675, Fed. Cas. No. 3,450. Ship ashore on reef off Florida coast. Fifteen vessels, carrying 152 men, worked, so far as boisterous weather permitted, for 13 days, and until stranded vessel broke up. Amount salved, $123,000. Award, 19 per cent.

1857. The Philah, 5 Adm. Rec. 693, Fed. Cas. No. 11,091a. Bark laden with cotton and molasses ashore on a reef near Tortugas, in a condition of great peril. Was got off after removing part of her cargo. Time short, and no particular peril to salving vessel, but without her help the bark would have been lost. Amount salved, $70,000. Award, $17,000 (about 24 per cent.).

1858. The Sierra Nevada, 6 Adm. Rec. 67, Fed. Cas. No. 12,846. A ship grounded on Florida reef, in imminent danger of total loss, was salved, after 36 hours' labor, by the aid of 8 wrecking vessels, carrying 92 men. Amount salved, $85,000. Award, $17,000 (20 per cent.).

1858. The Sultan, 6 Adm. Rec. 112, Fed. Cas. No. 13,601. Ship, laden with cotton and corn, ashore on a reef near Key West, with dangerous shoals on both sides, ahead and astern. Lightened, heaved off, and brought to port by aid of 12 wrecking vessels and 108 men, working four days and nights. Amount salved, $127,000. Award, $23,000 (about 18 per cent.).

1859. The E. M. Bicknall, 1 Bond, 270, Fed. Cas. No. 1,476. Steamboat ashore in Ohio river, in immediate peril of loss. Amount salved, $19,500. Award, 25 per cent.

1859. The Island City, 1 Cliff. 210, Fed. Cas. No. 55; Id. (1861) 1 Black, 121. Bark caught in ice near Hyannis in a gale. Three sets of salvors (joint value of vessels engaged, $131,000) work some 15 days. Amount salved, $70,000. Award, $13,000 (about 19 per cent.).

1860. The Eliza Mallory, 6 Adm. Rec. 428, Fed. Cas. No. 4,365. Ship stranded on Florida coast, a total wreck. Twelve wrecking vessels worked from one to five weeks. Amount of cargo salved, $56,445. Award, $16,241 (about 25 per cent.).

1860. The Huntsville, 12 Fed. Cas. 996. Steamer afire at sea reaches port, and, by aid of salvors, fire is extinguished. "There was not in any part of the service rendered * * * any immediate risk of life, nor was the property employed in salving exposed to any risk or danger. But the services were highly meritorious, and by them a valuable vessel has been preserved." Amount salved, $80,000. Award, 12 per cent.

1861. The Ocean Belle, 19 Fed. Cas. 200. Ship stranded 30 miles from Key West. Wreckers got her off in good weather, and towed to port. "Had the weather been bad, the ship, from her exposed situation, would have been in great peril of total loss." "In places where wrecking is a business, and salvors engage therein more from interest than humanity, the scale of salvage awards should be so adjusted as that it will never be to the interest of a salvor that a ship should be lost, and that it should always be to his interest that she should be saved in a condition as little damaged as possible." Amount salved, $105,000. Award, $17,000 (about 10 per cent.).

1865. The Ida L. Howard, 1 Lowell, 2, Fed. Cas. No. 6,999. Schooner, derelict, stranded in Boston harbor. Numerous salvors labored diligently during more than one day, materially assisted by a steamer furnished by the underwriters. Amount salved, $12,000. Award, $2,000 (about 16 per cent.).

1867. The Lovett Peacock, 1 Lowell, 143, Fed. Cas. No. 8,555. Schooner abandoned, but not derelict. Salvors brought her to port after 13 days of severe labor and hardship, and after encountering a gale in the gulf stream. Amount salved, $90,000. Award, 25 per cent.

1869. The Annie Leland, 1 Lowell, 310, Fed. Cas. No. 421. Schooner with cargo of coal stranded on rocks, and in a dangerous situation. Was got off and into port by salvors from the shore, at their own risk and responsibility, while captain and crew were dismantling schooner with intention of abandoning her. Time, a few hours only, and no danger. Amount salved, $11,000. Award, $2,600 (about 22 per cent.).

1869. The Albert Gallatin, Fed. Cas. No. 140. Ship burned at her anchorage, Mobile Bay. No risk, but a disagreeable and laborious service. Amount salved, $346,620. Award, $84,828 (about 21 per cent.).

1870. The Birdie, 7 Blatchf. 238, Fed. Cas. No. 1,432. Brig carried by the ice ashore on Long Island. So cold, crew had to leave to save their lives. Coast wrecking tug and a hired tug got her off. Amount salved, $19,000. District court allowed $288, which was paid for hired tug, and $240 (regular rates) for the other tug. Circuit court raised award to $1,200 (about 6 per cent.).

1872. The Anna, 6 Ben. 166, Fed. Cas. No. 398; Id. (1873) 10 Blatchf. 456, Fed. Cas. No. 401. Brig in collision, whereupon master and crew abandoned her, and went aboard colliding vessel. Salving vessel put two men aboard, and brought her into port. Was not required to deviate from her course, or lose any considerable amount of time, and sustained no loss, but laid out $600 for towing. Amount salved, $30,500. Award, $6,000 (about 20 per cent.). "Confessedly, the share of the property allowed is greatly less than the early practice of courts of admiralty would have sanctioned; and, in the changed condition of navigation, it is properly so."

1879. The Allegiance, 6 Sawy. 68, Fed. Cas. No. 207. Ship aground. Steam tugs got her off and towed her in. No serious risk. Amount salved, $47,000. Award, $5,000 (about 11 per cent.).

1882. The Sandringham, 10 Fed. 556. Steamship stranded on Cape Henry, within 100 yards of shore, where currents are often dangerous. Salvors, with a large force of vessels, wrecking apparatus, and men, after a week of hard and dangerous labor, in which highest degree of care was shown, succeeded in saving vessel and cargo. Amount salved, $200,000. Award, $50,000 (25 per cent.).

1883. The Egypt, 17 Fed. 359. A steamship of great value ashore on coast of Virginia, in imminent peril of total loss. Service rendered with extraordinary skill and success, the consumption of much time (eight days) and labor, and great risk to the property used in the enterprise, which was of great value. Amount salved, $250,000. Award, $50,000 (20 per cent.).

1884. The Queen of the Pacific, 21 Fed. 459. Steamship stranded on quicksand near mouth of Columbia river. Highly meritorious service, lasting two days. Amount salved, $736,786. Award, $64,700 (about 9 per cent.).

1888. The Kimberley, 40 Fed. 289. Steamship stranded in December off False Cape shoals. "All the elements of meritorious service concurred": (1) Great danger from which the property salved was rescued; (2) great value salved; (3) serious and continued risk incurred by salvors and their property; (4) great value of the property put at risk ($164,000); (5) extraordinary skill and perfect success in rendering the service; (6) much time and labor spent in the enterprise. Amount salved, $490,000. Award, first, $46,000, for actual outlay of labor and expenses, and, on top of it, 20 per cent. of the amount salved. An appeal was taken by claimants, but the delay would have operated so oppressively upon libelants that they settled at a heavy discount.

1889. The S. A. Rudolph, 39 Fed. 331. A schooner stranded on Jersey coast in snowstorm. Master and crew taken ashore by life-saving service. The salvors got her off, and towed to New York. Amount salved, $6,314. Award, $1,500 (about 24 per cent.).

1890. The City of Worcester, 42 Fed. 913, affirmed (1891) 45 Fed. 119. A steamer was stranded on Bartlett's reef, near New London. Her cargo was removed by wrecking company the next day without danger; the day being pleasant, and the water smooth. The next day was rough; new holes being worn in the steamer, in addition to those previously made. The wrecking companies, with a large outfit, were at work about two weeks. Bills of salvors for hire of vessels, materials purchased and used in repairs, sails used for patches, rope and anchors lost, aggregated $1,339. The cargo was worth about $100,000. "The services in salving the cargo were valuable, but were, in consequence of the exceptionally fine weather on Sunday, without danger,—were easily and quickly rendered. For these the sum of $1,218 should be paid" (between 1 and 2 per cent.). "An important element which enters into the determination of the amount due upon the libel [on the vessel] is the fact that each salvor is the owner of a valuable plant, which is constantly ready for service, and equipped with a crew which is constantly under pay. The calls for salvage service are occasional. The necessity for wages and repairs is continuous. The City of Worcester had the prompt benefit of a large plant, which was itself in some danger of injury." Amount salved (the steamer), $237,500. Award, $31,725 (about 13 per cent.).

1892. The Tregurno, 50 Fed. 946. Steamer ashore on Florida coast. A heavy wrecking force was engaged 25 days, being driven away several times by bad weather. There was no anchorage nearer than 25 miles. Two of the salving vessels were damaged while taking off cargo in heavy seas. Ultimate success as to ship and cargo. Amount salved, $205,-000. Award, $50,000 (25 per cent.).

1894. The Oxford, 66 Fed. 584. Steamer ashore in dangerous position on Florida reef. Salvage service lasted 13 days, and was rendered by 65 sailing vessels, 4 steamers, and 500 men,—much of it prosecuted at night, and in rough weather. "The large number employed on account of the length of time occupied by the service will so divide any amount which can reasonably be given that the individual shares, instead of being a bonus or a gratuity as a salvage, will scarcely compensate for the actual labor performed. That this has been the case is exceedingly to be regretted, but the amount cannot be increased on account of the large number of individuals employed to do a certain service. There were more than necessary, but that was an honest error of judgment. It was impossible for them to determine just what force might be re-

quired. * * * A reasonable compensation should be allowed, although nothing that can be considered as a bonus or gratuity can be reached." Amount salved, $155,000. Award, $37,114 (about 24 per cent.). A material reduction of the award for salving the ship was made on appeal. 13 C. C. A. 647, 66 Fed. 593.

1895. The Dania. 70 Fed. 398. Steamer utterly helpless from broken shaft about 360 miles from New York. Towed into that port by another steamer in two days and' two hours, without any difficulty, during weather which was fine, excepting a dense fog about half the time. Amount salved, $426,000. Award, $17,500 (about 4 per cent.).

1895. The North Erin, 71 Fed. 430. A tug, upon telegraphic request, went 80 miles to a steamer pounding on Long Island coast, in a position of some danger, with a cargo largely perishable, and succeeded after three hours in getting her off. A Coast Wrecking Company's steamer would have reached the steamer the next day. Value of tug, $50,000. Amount salved, $100,000. Award, 10 per cent.

1896. La Hesbaye, 71 Fed. 743. A steamship, with her rudder lost, was brought in, by the help of another steamer, to New York (1,100 miles). Service lasted nine days, and was difficult. Salvor lost four days. Amount salved, $100,000. Award, $8,000.

1896. The Alamo, 21 C. C. A. 451, 75 Fed. 602. A large steamer ashore on a Florida reef in a position of peril. A tug and sailing vessels got her off, and piloted her into port uninjured. Time, 24 hours. Amount salved, $500,000. Award, $15,000 (3 per cent.).

1896. The Elfrida, 23 C. C. A. 527, 77 Fed. 754. A steamer aground at Velasco, Tex., in a position of little danger, at a season when weather is nearly always mild and wind light. Service required but 15 or 16 men, a tug, barge, and small schooner, with anchors and cables. Time, 3 days. No danger to life or property, and no application of unusual skill. Amount salved, $70,000. An agreement for $22,000 was reduced to $10,000, which is about 14 per cent.